Lanier RAMER et al., Appellants,

v.

William B. SAXBE, Attorney General
of the United States.

No. 74–1483.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 11, 1975.

Decided Nov. 6, 1975.

Charles E. Lister, Washington, D. C., with whom Herbert Dym and Robert Plotkin, Washington, D. C., was on the brief for appellants.

Bette E. Uhrmacher, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Thomas G. Corcoran, Jr., Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, MacKINNON, Circuit Judge, and CHRISTENSEN,* Senior District Judge for the District of Utah.

Opinion for the Court filed by District Judge CHRISTENSEN.

Opinion filed by Circuit Judge Mac-KINNON, concurring specially.

CHRISTENSEN, District Judge.

The contention that the "policies" of the Bureau of Prisons have never been considered "rules" within the contemplation of the Administrative Procedure Act and therefore never should be, and the counterpoint that had they been the resulting broader input into them and more understanding compliance with them would constitute a much needed and salutary reform of the Federal Pris-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

on System,[1] come along and between the lines of the briefs like Sandburg's Fog. However, such a confrontation will have to move on to another time or case. The district court, having permitted prisoners complaining of lack of compliance by the Bureau with APA to cross the threshold, unceremoniously ushered them back to it after almost a year of considering motions to transfer, to bring in new parties, to amend and for summary judgment, and sent them piking up to this court by deciding *sua sponte* that their cause was not justiciable.

The validity, or more descriptively the invalidity, of the latter ruling is all that need be decided here, aside from the government's claim of post-appeal mootness which we reject. We agree with appellees that rather than attempt to determine now what specific "policies" or rules must be published to satisfy the Act, further processing of the problem by the district court would be desirable, and we therefore remand. But to give point to such remand we recognize in the context of this case that the Bureau of Prisons is, indeed, an "agency" within the definition of the APA, 5 U.S.C. § 551, and that its rule making is subject to applicable requirements of that Act.

At the time this action was commenced plaintiffs-appellants Lanier Ramer and Jerry Desmond were federal prisoners incarcerated in the Federal Penitentiaries at Marion, Illinois and Leavenworth, Kansas, respectively. They brought suit against the Attorney General of the United States and the Director of the Federal Bureau of Prisons upon allegations that the district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1361, 2201, and 2202, that defendants in violation of sections 3 and 4 of the Administrative Procedure Act, 5 U.S.C. §§ 552 and 553, failed to publish in the Federal Register notices of rule making and the texts of numerous rules and regulations issued in the administration of federal penal and correctional institutions, by reason of which failures the plaintiffs suffered, and were threatened by loss of rights and privileges, and became entitled to declaratory, injunctive and mandamus relief.[2]

An amended complaint was tendered with a motion for leave to file. This would have added as parties plaintiff two additional inmates of other institutions, together with an agency interested in prison reform. Defendants-appellees requested the court to postpone that ruling until motions for summary judgment were determined. So far as the record before us discloses, there was no ruling on the initial motion for leave to amend, but the district court expressly denied plaintiffs' motion for leave to file a second amended complaint for the purpose of naming as a party plaintiff still

---

1. The Chief Justice has pointed to the "terrifying magnitude" of the problems of the correctional process and among many important observations has stated: "We cannot turn the management of a prison over to the inmates, but society, as represented by the 'keepers', can listen to what the inmates have to say." Remarks at the National Conference on Corrections, Dec. 7, 1971. "The procedure of administrative rule making is one of the greatest inventions of modern government." Davis, *Administrative Law Treatise*, § 6.15, p. 283 (1970 Suppl.).

2. Paragraph 13 of the original complaint (paragraphs 15 and 17 respectively of proposed amended complaints) reads as follows:

"Plaintiffs already have suffered, and continue to be immediately threatened by, severe and **irreparable injuries by reason of defendants' failure to comply with the requirements of the Act.** Plaintiffs are now, and will in the future continue to be, without adequate notice or knowledge of the rules and requirements embodied in the 'policy statements' promulgated by defendants. Accordingly, plaintiffs are now, and will in the future continue to be, denied adequate opportunities to contest the validity of such rules, to participate in the formulation of such rules, to contest the application of such rules to their conduct, and to regulate their conduct so as to avoid violation of such rules. As a result, plaintiffs are arbitrarily and without constitutional justification threatened by losses of privileges, the imposition of disciplinary measures, and other severe losses and injuries."

another federal prisoner then incarcerated in the United States Correctional Institution at El Reno, Oklahoma.

The order denying such leave recited "that the legal issues have been clearly defined in the plaintiffs' pending motion for summary judgment and that the addition of other plaintiffs to this suit would be of no assistance to the court or the parties in resolving these issues . . . [and] that justice does not require that leave be given to amend the complaint. . . ." The proposed second amended complaint, tendered November 2, 1973, alleged that Ramer was then incarcerated in the United States Penitentiary located at Terre Haute, Indiana, and that Desmond was on mandatory release status in Seattle, Washington.

The parties filed cross-motions for summary judgment, supported by affidavits. While the trial court did not rule upon these motions, we have looked to their supporting affidavits to see if facts were suggested to commend at least some opportunity for supplementing the pleadings before a dismissal of the action as nonjusticiable. We believe the trial court improperly closed its eyes to the affidavits since their allegations would have fleshed out the more general assertions of the complaint and thus negated the assumed lack of concrete impact or injury from the Board's unpublished policies or rules. There had been no objection to the pleading on the ground of

indefiniteness. The justiciability of the action should not have depended upon the preciseness of the allegations in the complaint, especially if there were reasonable indication otherwise that amended pleadings or proof to which they could be conformed would correct deficiencies.

An affidavit of the Acting Director of the Bureau of Prisons represented that "[t]hose Statements [of 'policies'] which regulate inmate conduct provide guidelines for the preparation of local policy statements, issued by the individual institution". But wardens of two of these institutions swore that "all regulations of this institution are within the guidelines established in Bureau regulations and in no way are inconsistent with or exceed the authority given to us by these regulations." It was also stated by the wardens that "a set of the most significant Bureau and institution regulations, including the regulations concerning inmate discipline and forfeiture of good time, are readily available in the institutional law library for use of inmates in general population, and a duplicate set is available in segregation for use of inmates in segregation." [3]

To the contrary, affidavits filed by plaintiffs put into question both the availability of policy statements in prison libraries and the absence of personal detriment resulting from the non-publication and unavailability of the governing rules.[4]

---

**3.** The question of their availability through different means would not affect the obligation of publishing "statements of general policy" falling within the requirements of 5 U.S.C. § 552(a)(1)(D). But to the extent the question could be thought to bear upon the problem of injury or impact, we pursue it here.

**4.** The Desmond affidavit contained these statements with many others:

"[M]y mandatory release status could be revoked . . . During my years at various federal prisons I was never able to locate a complete and up to date set of policy statements . .. . On one occasion I appeared before a good time forfeiture board without access to the disciplinary and good time forfeiture regulations. Throughout the period at is-

sue in this suit, I can state that the policy statements most relevant to the affairs, and conduct of prisoners were most assuredly not made readily available to me while a prisoner at McNeil Island, Lompoc, California, El Reno, Oklahoma; Leavenworth, Kansas; or Marion, Illinois. I repeatedly attempted to gain access to relevant Bureau and Local Policy Statements at all of the mentioned institutions. Responses have varied from denials that the policies existed at all to forthright refusals to allow me to see them . . . I have been threatened with physical and circumstancial [sic] retaliation, repeatedly, at all of the named institutions for having the audacity to demand access to such policy statements. . . . I was released on Mandatory Release status subject to revocation and, by statute, am on

The wife of the appellant Ramer alleged that in spite of repeated requests to the Bureau she had never been sent copies of their regulations and policy statements; that she had been cut off from his visiting list three times for alleged violation of visiting regulations; that one of these violations by her was the reason for charges being brought against the appellant Ramer which resulted in his losing good time and which were litigated in *Workman v. Kleindienst*, No. 8–71C3 (W.D.Wash.1973), in which "the Court ruled there that the Bureau acted illegally by not complying with their own regulations when they forfeited Lanier's earned good time."

Other inmates by affidavit gave examples of their inability to get copies of prison regulations or "policies" and furnished instances of claimed prejudice that resulted. The Chairman of the Washington State Bar Association Corrections Committee alleged that attorneys and law students were frustrated by lack of access to Bureau regulations and described his efforts to bring about an improvement in availability of the information.[5]

---

exactly the same status as if I were on parole . . . An examination of the Bureau's policy statements will demonstrate that many policies relate to matters which directly affect citizens who are not imprisoned . . . [a]ttorneys, relatives and friends of prisoners and the public at large. . . ."

The Ramer affidavit stated in part:

"[Upon reading the affidavit of the Warden concerning the availability of policy statements at the prisoners' law library] [I] found that members of the general population are proscribed from entry and only prisoners assigned to that location are permitted to examine the library in person; all other prisoners must stand at a closed door in the entryway and ask for what they want to use through a six-by-ten inch opening. I asked for an index of policy statements and was informed by a law librarian . . . that no such listing of available policy statements exists . . . Numerous policy statements contained in the folders have been superseded by re-statements of policy and the re-statements have not been made available . . . No administrative means known to the prisoner law-librarians exists for obtaining either an index of current policy statements or the policy statements themselves . . . Prisoners do not, factually, have access to the law library; save through an intermediary's willingness to search for what is desired . . . Repeated efforts over a period of nine years to secure access to such documents have met with repeated rebuffs by prison staff members from line-guards up to and including wardens at McNeil Island in Washington State, Lompoc in California, Florence federal detention center in Arizona, LaTuna federal prison in Texas, Marion federal prison and Terre Haute in Indiana. The effects of this enforced ignorance result in disparities of treatment that often devolve [sic] to prisoners being compelled, by the arbitrary whim and caprice of bureau of prisons' employees, to lose family and community ties, suffer additional time in prison, submit to de-

basing and demeaning conditions of confinement proscribed by official Bureau policies and limits severely the exercise of basic civil liberties that are accorded some measured indulgence by *Bureau* policies. . . .

"Failure of the U.S. Bureau of Prisons to comply with the Administrative Procedures Act . . . brings about in my experience . . . that when a prisoner finally despairs of bringing some order into the administrative guidelines that supposedly govern his life and seeks access to a federal court for redress, the initial response of the U.S. Bureau of Prisons legal councilors [sic] is invariably to present a current, or possibly post-dated, policy revision designed to moot the issue presented and lead to dismissal of a prisoner's arduously articulated complaint; and all too often the prisoner then finds that the 'new' policy statement is vitiated utterly in practice at the institutional level, leaving him to go through the entire procedure anew . . .

"As this matter presently rests neither prisoners, their family members, other community ties, nor their attorneys—in short *all* of those persons most directly and immediately affected by u. s. bureau of prisons [sic] policies—have the least input into what policy is in any given area, nor any comprehension of what it might be. . . ."

5. "When one objects to an action by a prison staff member, one must have access to the applicable Bureau regulation to know who the controversy is with. If the staff action is contrary to the regulation, the issue is with the local staff. Conversely, if the action is in accord with the regulations or is not covered by them, the issue may be with the Bureau itself . . . In the spring of 1972, I met with [the Bureau Director] . . . in Washington, D. C. At the request of lawyers . . . and law students, I asked whether Bureau Regulations could be made available to lawyers at convenient places, preferably law libraries, in the State of Washington. Mr. Carlson answer-

In dismissing the action "for lack of jurisdiction", the district court found "that it need not face the procedural and substantive questions raised by the parties because plaintiffs have 'failed to satisfy the threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy', *O'Shea v. Littleton,* [414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674] 42 U.S.L.W. 4139, 4141." It commented after quoting paragraph 13 of plaintiffs' complaint (already set out in the margin, n. 2):

> "From this statement it is apparent that no threat of interference by defendants with the rights of plaintiffs is alleged beyond that implied by the present attitude of the Bureau of Prisons toward the applicability of the Administrative Procedure Act . . . That no substantial concrete controversy exists is made clear by the relief that plaintiffs request. In addition to injunctive relief, plaintiffs ask the court to issue a declaratory judgment that the policy statements described in the complaint are subject to the requirements of sections 3 and 4 of the Administrative Procedure Act. However, no such policy statements are presented to the court in a factual setting that could be described as adversary. Plaintiffs would have the court

pass on the legal status of each policy statement without the benefit of their 'concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.' *Baker v. Carr,* 369 U.S. 186, 204 [82 S.Ct. 691, 7 L.Ed.2d 663] (1962). This court will not undertake such a task. *See O'Shea v. Littleton, supra.* . . ."

There is no necessity for rewalking the grounds since explored and occupied by *Pickus v. United States Board of Parole,* 165 U.S.App.D.C. 284, 507 F.2d 1107 (1974). This decision has cleared out the argumentative underbrush[6] obscuring these central problems remaining for our decision: I. Whether absent more specific complaint of damage or impact to plaintiffs from the actual application or enforcement of Bureau "policies" a justiciable case or controversy existed; II. Whether the situation of the plaintiffs as to release or incarceration following their appeal to this court has mooted the case; III. Whether in any event the case can be fully determined by this court or must be remanded for further proceedings in the district court.

## I.

The point was not specifically discussed in *Pickus,* and indeed it may not have been raised there, but that decision seems premised on the assumption that

---

ed that the Bureau did not publish its regulations. He did, however, offer to provide me with copies of those policy statements that he felt were relevant to the Corrections Committee concerns. . . . I then asked that I be placed on a list so that the regulations given me would be automatically updated by mailings of new additions as they were issued. Mr. Carlson answered that the Bureau had no procedure for issuing new regulations and that I should write the Bureau from time to time and ask for an update of the specific regulations given me . . . For too long the Bureau of Prisons has operated under a cloak of mystery . . . In my opinion, a contributing factor to this situation has been the lack of knowledge by the bench and bar of the operating rules of the prison system. . . . For a lawyer facing a controversy with the prison staff, the Bureau's regulations are an essential research tool. A lawyer is likely to

need that tool immediately on encountering the controversy. It is unconscionable that he should have to depend on his adversary, the Bureau, for access to the tools he requires."

6. *Pickus* rejected several contentions of the appellees by deciding in effect that the Bureau of Prisons is an "agency" for the purposes of the APA; that its so-called "policies" or "guidelines" generally controlling the activities, conduct and discipline of persons under its custody or control could not be considered mere internal management policies, technical regulations, interpretive provisions or rules of agency organization, practice or procedure, but are subject to the notice or publication requirements of APA; and that the district court had, and thus the appellate court has, subject matter jurisdiction by virtue of § 10 of APA, if not otherwise.

Bureau of Prisons regulations which affect and control daily activities, rights and disabilities in a special setting and for the ignoring or compliance with which penalties or rewards may be visited, present by their very existence sufficient impact upon a convict's life as to make him an aggrieved person and to afford him standing to question their validity.[7] That this must be so more clearly emerges from our examination of the circumstances of the present case and the contrasting situation in other cases in which nonjusticiability has been found. Beyond this, we are convinced that more specific applications were so strongly suggested by the record as to have rendered prejudicially precipitous the dismissal of plaintiffs' action on the ground of nonjusticiability without at least affording further opportunity for the demonstration of even more direct and concrete impact.

*O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), *supra,* upon which primary reliance was placed by the district court, involved significantly different circumstances.[8] Seeking an injunction [against a magistrate and a judge] "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials" in the enforcement of "seemingly valid state laws" (414 U.S. at 500, 94 S.Ct. at 678) is quite different from an effort to secure from an agency charged with the duty of formulating and publishing rules for the governance of inmates in federal institutions, or in the community under parole or conditional release, information concerning the unpublished rules with which they are expected to comply. The appellants' subjection to the unpublished and allegedly undisclosed rules was not speculative but a day by day reality from the very nature of their situations.[9]

---

7. "We have considered the Board's argument that its promulgation of parole selection criteria is not subject to judicial review . . . because release on parole is committed to agency discretion . . . But we are not reviewing the granting or denying of parole in a particular case, action which may reflect an unreviewable exercise of agency discretion. We are not even reviewing the merits of the rules and standards the Board has adopted. The appellees' complaint and our consequent adjudication address themselves solely to the procedures by which those rules may be formulated. . . ."

8. Concerning the allegations of the complaint in *O'Shea* the Supreme Court said:

"In the complaint that began this action, the sole allegations of injury are that petitioners 'have engaged in and continue to engage in, a pattern and practice of conduct . . . all of which has deprived and continues to deprive plaintiffs and members of their class of their' constitutional rights and, again, that petitioners 'have denied and continue to deny to plaintiffs and members of their class their constitutional rights' by illegal bond setting, sentencing, and jury-fee practices. None of the named plaintiffs is identified as himself having suffered any injury in the manner specified. In sharp contrast to the claim for relief against the State's Attorney where specific instances of misconduct with respect to particular individuals are alleged, the claim against petitioners alleges injury in only the most general

terms. At oral argument, respondents' counsel stated that some of the named plaintiffs-respondents, who could be identified by name if necessary, had actually been defendants in proceedings before petitioners and had suffered from the alleged unconstitutional practices. Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects. Neither the complaint nor respondents' counsel suggested that any of the named plaintiffs at the time the complaint was filed were themselves serving an allegedly illegal sentence or were on trial or awaiting trial before petitioners. . . ." 414 U.S. at pp. 495–496, 94 S.Ct. at p. 676.

9. *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), exemplifies the controlling effect which a Bureau "policy statement" may have on a single and generally minor aspect of a prisoner's life. Multiply such an aspect by the full panoply of institutional living and the potential impact of Bureau "policy" becomes even more apparent. Although specific impact was clearly demonstrated there, this court has observed in a commercial setting: "The command of the Administrative Procedure Act is not a mere formality. Those who are called upon by the government for a countless variety of goods and services are entitled to have notice of the standards and procedures which regulate these relationships. Neither appellants nor others

Although no "precise test" is possible, basically the question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Examples of "aggrieved" persons who have met the test are instructive. See, *i. e., Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Trafficante v. Metropolitan Life Ins.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Lake Carriers' Assn. v. MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

*United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), is distinguishable. There federal civil service employees alleging a desire to engage in acts of political management and in political campaigns contrary to the prohibition of a Civil Service rule and the Hatch Act, but not alleging that prohibition to have been violated, were held not to have made out a justiciable case by which constitutional issues might be adjudicated. Here there is no attack against regulations upon the ground of their unconstitutionality; simply a claim that rules purportedly governing their conduct have not been adopted or published in the manner required by law.

█ Appellants have not sought to raise a due process claim nor do we think

similarly situated can turn to any official source for guidance as to what acts will precipitate a complaint of misconduct. . . . ."

they must in order to get the ear of the court. They should not be turned away because they did not in the first instance further particularize the specific applications that would prejudice them. They are not complaining about any single application, nor should they be compelled to; they say that none of the regulations applicable to their day by day conduct has been validly-made or published. But a court made due process problem would appear intrinsic in the situation were we to hold that appellants before they can complain about the inavailability of legally required information concerning regulations governing them would have to obtain the information other than as provided by law or anticipate with particularity what prejudice they might suffer from disregard of unknown regulation of which they had a right to be informed in the manner provided by law.

In addition to *O'Shea,* other recent decisions of the Supreme Court, while sustaining dismissals for lack of standing under the circumstances there, furnish backboards against which the contrasting circumstances of the present case may be banked, and obviate the necessity of our attempting to further explicate the "case or controversy" requirement and its interrelationship with the question of standing: *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), determined that the respondent did not have standing to bring an action as a federal taxpayer upon the claim that certain provisions concerning public reporting of expenditures under the Central Intelligence Agency were unconstitutional. *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), held that neither as citizens nor as taxpayers did the respondents have standing to challenge membership in the Armed Forces Reserve of members of Congress as violating the Incompatibility Clause of Article I of the Constitution.

*Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 334 F.2d 570 (1964).

In the present case there does exist a "logical nexus" between the situation of appellants as inmates or conditional releasees and the unprocessed, unpublished, and allegedly unknown regulations governing them. The grievance here is not a merely "generalized" one but is based upon sustained, inescapable and continuing, as well as threatened, control of persons most directly affected by the Bureau's alleged failure to comply with the Administrative Procedure Act.[10]

■ The question of technical or even substantive sufficiency of the pleadings for other purposes is not controlling in the resolution of the basic question of justiciability, since it is to be assumed that justiciable actions will be processed in accordance with the rules governing the subject of pleading, including amendments to pleadings, and are entitled to be. Cf. *Wren v. Carlson,* 165 U.S.App.D.C. 70, 506 F.2d 131 (1974), where this court held that jurisdiction was present to consider an attack by a prisoner against a Bureau of Prison "policy" despite the questionable nature of its pleading. In contrast to the brief and mechanical inspection of the complaint made by the district court, there must be a "sure-footed judicial appraisal of the pertinent factors" based upon "wide-ranging and flexible analysis." *Davis v. Ichord,* 143 U.S.App.D.C. 183, 196, 442 F.2d 1207, 1220, Leventhal, J., concurring (1970).

We conclude that this case was and remains justiciable, that subject matter jurisdiction existed, and that the plaintiffs had standing to raise the issues presented.

## II.

■ The problem of mootness need not long detain us in view of *Pickus,* 165 U.S.App.D.C. 284, 507 F.2d 1107 (1974), *supra.* Until recently at least one of the plaintiffs continued in custody, the other for a time being on mandatory release status. At the oral argument it was reported that the one first on mandatory release status had been arrested on a violator's warrant and the other was on mandatory release status. It is ironical that the lower court's refusal to permit the adding of additional parties plaintiff on the ground that "the legal issues already had been clearly defined" and that their addition "would be of no assistance to the court or to the parties" should jeopardize the continued viability of the cause. But these shifting situations should not moot the case in view of all of its circumstances and implications.

Whether actually incarcerated or in parole or mandatory release status, the appellants continue subject to the rules and regulations of the Bureau of Prisons. Indeed, the continuance, expiration or revocation of each of these situations may be dependent significantly upon the existence and appellants' knowledge of pertinent policies of the Bureau. A list of its policy statements forming a portion of the record indicates that they deal both with confinement and release situations. The extent to which the latter may constitute rules subject to the

---

10. The contention has not been pressed in the present case, but it has been held in other contexts that failure to comply with rule making procedures under APA is fatal to the validity of the rules themselves. See, *e. g., NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *Pickus v. United States, supra; United States v. Finley Coal Company,* 493 F.2d 285 (6th Cir.), *cert. denied,* 419 U.S. 1089, 95 S.Ct. 679, 42 L.Ed.2d 681 (1974); *Wagner Electric Corporation v. Volpe,* 466 F.2d 1013 (3d Cir. 1972); *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972); *City of New York v. Diamond,* 379 F.Supp. 503 (S.D.N.Y.1974); *Kelly v. United States Department of Interior,* 339 F.Supp. 1095 (E.D.Cal.1972); *National Motor Freight Traffic Ass'n v. United States,* 268 F.Supp. 90 (D.C.D.C. Three Judge Court 1967), *aff'd per curiam,* 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). Cf. *Mobil Oil Corporation v. Federal Power Commission,* 157 U.S.App.D.C. 235, 483 F.2d 1238 (1973); *Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 334 F.2d 570 (1964), *supra.* This point goes more to the merits of plaintiffs' claim; but the mere possibility of such consequence with reference to certain "policies" of the· Bureau further supports justiciability in the sense of emphasizing concrete impact upon the appellants and those similarly situated.

requirements of APA is a problem for further attention by the trial court in considering and framing any declaratory judgment. There is no basis for barring consideration altogether on the ground of mootness.

█ A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome . . . [w]here one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." *Powell v. McCormack,* 395 U.S. 486, 496–97, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). A case is not moot so long as any single claim for relief remains viable, whether that claim was the primary or secondary relief originally sought. Id. at 496, 500, 89 S.Ct. 1944; see also *United States v. SCRAP, supra,* at 689 n. 14, 93 S.Ct. 2405; *Lake Carriers' Assn. v. MacMullan, supra,* at 507, 92 S.Ct. 1749; *Bond v. Floyd,* 385 U.S. 116, 128 n. 4, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966).

Moreover, it has been stated more than once that, aside from the weighing of other considerations, mootness may not be invoked to deny adjudication of questions which are "capable of repetition, yet evading review". *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), *supra; Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Brown v. Chote,* 411 U.S. 452, 457 n. 4, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973); *Dunn v. Blumstein,* 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Carroll v. Princess Anne,* 393 U.S. 175, 178–79, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Southern P. T. Co. v. Interstate Com.*

*Com.,* 219 U.S. 498, 515–16, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

We agree with appellants that persistent refusal to comply with the publication requirements of the Administrative Procedure Act necessarily creates issues which are readily capable of repetition and may evade review. At issue is a continuing question which involves important consequences for all federal prisoners, their families and their attorneys. Despite the inevitability of their recurrence, the questions presented could evade resolution if such actions as this must be dismissed. If the appellees are correct in their apparent position that only persons actually in custody, and not having access to policy statements otherwise, may press these issues, it may be difficult to find any single plaintiff who would remain eligible to do so throughout lengthy adjudicatory processes.[11] There is here more than a mere possibility of repetition of injury to the named plaintiffs; there is according to their complaint a continuing application to them of improperly adopted rules. We need not consider at this time whether persons less directly interested would have standing to question non-publication of "statements of general policy" in violation of the requirements of 5 U.S.C. § 552(a)(1)(D), as distinguished from the rule making requirements of § 553.

### III.

Appellees say that "[e]ven assuming *arguendo* that there existed, at the time of the District Court's dismissal, a case or controversy, and that subject matter jurisdiction was present, the instant causes of action must nevertheless be remanded to the District Court for consideration of the question of mootness." We disagree. Of course this case, as any

---

11. The appellants point out in their reply brief with good reason:

"Similar difficulties can be expected to bedevil every subsequent effort to resolve defendants' obligations under the Administrative Procedure Act. If this case is dismissed, every subsequent effort to raise the same issues is also likely to terminate inconclusively. Such a result would be both unjust to those persons whose interests are affected by defendants' 'policy statements' and also an obvious misallocation of scarce judicial resources."

other, may be mooted by new circumstances arising while it is before the district court after remand for other purposes. But we are satisfied that nothing suggested now has rendered the case moot.

Nonetheless, we cannot agree with the appellants that enough already appears on the record to permit our declaring as a matter of law the rights and obligations of the parties without the necessity of further consideration by the district court. It does appear quite unlikely that present Bureau regulations or "policies" governing the conduct and control of prison inmates in all of the indicated aspects do not contain at least some provisions falling within the requirements of § 553 as well as § 552(a)(1)(D). But the dismissal on the ground of nonjusticiability precluded development of a record adequate for precise identification, differentiation and definition in the context of this case. Moreover, questions of remedy have not even been touched upon, and in other respects it would be appropriate for the trial court to complete its consideration of the issues beyond the threshold bar it improvidently created.

Accordingly, the order of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion, including reconsideration in light of Rule 15(a) Fed.R. Civ.P. of any renewed application to add additional parties plaintiff. Cf. *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

Reversed and remanded.

MacKINNON, Circuit Judge (concurring specially):

I agree that the District Court erred in dismissing the complaint on grounds of nonjusticiability and I also agree that the case is not moot. As this is sufficient to justify reversing and remanding the case for further proceedings, I concur in the result reached by the majority.

The Bureau of Prisons admits that the material appellants seek are "policy statements." [1] Under the Administrative Procedure Act, such statements either must be published in the Federal Register if they are "statements of general policy," [2] or else must be made available to the public for inspection and copying.[3] Thus appellants are clearly entitled to disclosure of the Bureau's "policy statements" in some manner. However, I agree that consideration of the appropriate relief to be afforded appellants is best left to the District Court in the first instance.

I am not in agreement with the suggestion that our decision in *Pickus v. U. S. Board of Parole*, 165 U.S.App.D.C. 284, 507 F.2d 1107 (1974), is completely controlling here.[4] Like the Board of Parole, the Bureau of Prisons is undoubtedly an "agency" for the purposes of complying with the APA. However, as to appellants' contention that the "policy statements" are "rules" with respect to which the Bureau is required to give notice of proposed rulemaking under 5 U.S.C. § 553 before they may be adopted

---

1. Answer, ¶ 7; J.A. at 11.

2.     (a) Each agency shall make available to the public information as follows:

    (1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

       \*    \*    \*    \*    \*

    (D) . . . *statements of general policy* or interpretations of general applicability formulated and adopted by the agency.
    .  .  .

5 U.S.C. § 552(a)(1)(D) (1970) (emphasis added).

3.     (2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

      \*   \*   \*   \*   \*   \*

    (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

      \*   \*   \*   \*   \*   \*

unless the materials are promptly published and copies offered for sale. . . .

5 U.S.C. § 552(a)(2)(B) (1970).

or amended, it is at least arguable that parole regulations may be subject to stricter rulemaking requirements than prison policies for the daily operation of penal institutions. Some of these policies may not have the substantial effect on the rights of persons subject to agency regulations which *Pickus* holds is the test for applying the notice and hearing requirement. The court will need considerably more than the present meager record before the application of section 553 to these "policy statements" can be adequately assessed. At this stage of the proceedings, I would not suggest that *Pickus* has authoritatively disposed of the issues presented by this complaint.

4. *See* Majority op. 173 U.S.App.D.C. at p. ——, 522 F.2d at p. 700 n. 6.