Joel D. JOSEPH et al., Appellants,

v.

UNITED STATES CIVIL SERVICE
COMMISSION et al.

No. 75–1647.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 10, 1976.

Decided Jan. 17, 1977.

Joel D. Joseph, Washington, D. C., for appellants. Ann R. Steinberg, Washington, D. C., was on the brief for appellants.

Jordan A. Luke, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Ann S. DuRoss, Asst. U. S. Attys., Washington, D. C., were on the brief for appellees.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge TAMM.

Concurring opinion filed by Circuit Judge MacKINNON.

TAMM, Circuit Judge:

■ In this appeal eight residents of the District of Columbia ask this court to reverse a district court's summary judgment upholding the validity of a regulation of the Civil Service Commission. The challenged regulation exempts participation in political campaigns as or on behalf of an independent candidate in a partisan election[1] for local office in the District from the otherwise applicable prohibitions of the Hatch Political Activity Act (Hatch Act).[2] Appellants argue that the district court erred in deciding that the challenged regulation was exempt from the notice and comment provisions of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970).[3] The Civil Service Commission not only denies

---

1. The term "partisan election" has not been directly defined by either the statute or regulations. The Civil Service Commission has defined the term "partisan" when used as an adjective to refer to a political party, 5 C.F.R. § 733.101(f) (1976), and "nonpartisan election" means

> [a]n election at which none of the candidates is to be nominated or elected as representing a political party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected . . ..

Id. § 733.101(e). A "partisan election" must therefore be an election wherein at least one candidate represents a party which fielded a candidate in the last presidential election.

2. The provisions of the Hatch Act and its amendments which are relevant to this litigation have been codified in title 5 of the *United States Code* and enacted into positive law. 80 Stat. 378. Hereinafter section references to the Hatch Act as currently in force will be given in terms of the appropriate section of title 5.

3. Appellants also argue that the district court erred in its determination that the Commission's exemption regulation is constitutional under the holding of *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

the merits of appellants' argument, but also asserts that appellants have failed to present a justiciable claim. We find that at least those appellants who are currently employed by the federal government have standing to challenge the Commission's regulation; that the issues presented by appellants are ripe for judicial review; and that the regulation was not exempt from section 4. Consequently we hold that the Commission's failure to follow the procedure required by section 4 renders its exemption regulation for the District of Columbia invalid. The judgment of the district court to the contrary is reversed.

We also note that an examination of the language of the legislation granting the Commission its power to exempt certain statutorily defined municipalities and political subdivisions from Hatch Act prohibitions raises doubts about the Commission's authority to include the District of Columbia within any exemption. This issue was not raised by the parties,[4] and the record currently before us is inadequate for a clear resolution of the question. In the interests of judicial efficiency, however, we offer the Commission our views on the proper statutory interpretation since if it decides to reissue its regulation under section 4, the Commission must indicate the legal authority under which the regulation is proposed. *See* Administrative Procedure Act, § 4(b)(2), 5 U.S.C. § 553(b)(2) (1970).

Subsection 7324(a)(2) of the Hatch Act forbids an employee in an executive agency or an individual employed by the District of Columbia government to take an active part in political campaigns. Subsection 7327(b), however, provides that:

The Civil Service Commission may prescribe regulations permitting employees and individuals to whom section 7324 of this title applies to take an active part in political management and political campaigns involving the municipality or other political subdivision in which they reside, to the extent the Commission considers it to be in their domestic interest, when—

(1) the municipality or political subdivision is in Maryland or Virginia and in the immediate vicinity of the District of Columbia, or is a municipality in which the majority of voters are employed by the Government of the United States; and

(2) the Commission determines that because of special or unusual circumstances which exist in the municipality or political subdivision it is in the domestic interest of the employees and individuals to permit that political participation.

5 U.S.C. § 7327(b) (1970). The Commission has exercised this exemption authority by designating a list of municipalities wherein an employee

may take an active part in political management and political campaigns in connection with partisan elections for local offices . . . subject to the following limitations:

(1) Participation in politics shall be as an independent candidate or on behalf of, or in opposition to, an independent candidate.

5 C.F.R. § 733.124(c)(1) (1976).

On May 30, 1974 the Civil Service Commission added the District of Columbia to its list of exempted municipalities with an effective date of May 16, 1974. 39 Fed.Reg. 18761 (1974). Shortly thereafter appellants

4. Appellants did raise this issue before the district court. In their Memorandum of Points and Authorities opposing the Commission's motion for summary judgment and supporting their cross motion for summary judgment appellants argued that the Commission failed to comply with the requirements of subsection 7327 because it did not find that a majority of the voters in the District of Columbia are employed by the government of the United States before it added the District to the exemption list. Their complaint, however, only raised

questions of procedural impropriety under the Administrative Procedure Act and constitutional objections to the substance of the regulations. Consequently in its motion for summary judgment, which was granted by the district court, the Commission only addressed the procedural and constitutional issues. In their briefs for this appeal neither party raised the question of the Commission's authority under subsection 7327 to add the District to its exemption list.

filed suit in the United States District Court for the District of Columbia challenging the Commission's action as both procedurally improper and unconstitutional. Appellants argued that the addition of the District of Columbia to the Commission's exemption list was a rulemaking action subject to the notice and comment requirements of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970), which the Commission failed to follow. They also raised constitutional objections to the substance of the exemption regulation to the extent that it permits political activity in support of one type of candidate but prohibits such activity in support of other candidates in the same election. The Commission filed a motion for summary judgment arguing that the addition of the District to the exemption list was an interpretative rule exempt from the requirements of section 4 and that the constitutionality of the exemption had been upheld by *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). After considering appellants' arguments in opposition, the district court granted summary judgment for the Commission on the authority of *Letter Carriers* and the exception to section 4 of the Administrative Procedure Act for interpretative rules. Appellants now challenge the correctness of that judgment.[5]

## I. JUSTICIABILITY

The Commission argues that appellants have failed to allege sufficient injury to establish standing or to show that their claims are ripe for adjudication. For the purposes of analyzing these arguments, the appellants can be divided into three distinct

groups. Jerry A. Moore, Jr., Polly Shackleton and David A. Clarke are elected members of the District of Columbia City Council representing either the Republican or Democratic political party. Lawrence A. Fox, Ronald A. Margolis, Mark A. Rothstein and Robert E. Silver are all employees of the federal government who have made donations to Democratic candidates for the District's City Council and would like to take an active role in the management of their campaigns. Kenneth J. Oliver is interested in obtaining employment with the federal government and as a member of the Democratic Party he would like to actively support Democratic candidates in future District elections.[6]

### A. *Standing*

In order to challenge governmental action in a federal court a plaintiff must show that he is "injured in fact." *Sierra Club v. Morton*, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The injury need not be substantial. A trifle is enough for standing. *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). "Injury in fact" distinguishes the person with a direct, although sometimes small, stake in the result of a case from the person with only an interest in the legal issues presented. *Id.* Although this line drawing function of the standing rule is conceptually clear, determining on which side of the line a particular factual situation falls is often quite difficult. *See* K. Davis, Administrative Law in the Seventies § 22.02–10, at 507 (1976).

Even applying the most liberal interpretation of injury, we cannot find that

5. On appeal appellants continue their attack on the constitutionality of the Commission's exemption regulation. In light of our decision that the regulation is invalid because its promulgation was procedurally improper we do not reach any of the constitutional issues and express no opinion on the merits of appellants' arguments.

6. Joel D. Joseph, the named plaintiff, was an unsuccessful Democratic candidate in the 1974 District of Columbia City Council election. He

had alleged that his campaign was harmed because many of his supporters were not allowed to become involved in his campaign because they were employed by the federal government. He also had alleged that he intended to seek elective office in the District of Columbia as a Democrat in the future. On July 8, 1975, however, Joseph withdrew as a party to this suit. Therefore there is no reason to consider any questions as to his standing to raise the issues presented by this case.

Oliver has established a personal stake in the outcome of this litigation. He is not employed by the federal government. He is not currently applying for such employment. There is no reason to suppose that he will be injured by the Hatch Act's restrictions because of the Commission's refusal to include partisan candidates in its exemption for local elections of the District of Columbia. There are simply too many contingencies between Oliver's interest in supporting Democratic candidates in District elections and any possible application of the Hatch Act prohibitions to that activity to say that the threat of injury to him is real and immediate, rather than conjectural or hypothetical. See *O'Shea v. Littleton,* 414 U.S. 488, 494–97, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

Appellants Fox, Margolis, Rothstein and Silver, unlike Oliver, are presently employed by the federal government. They each desire to participate in the campaigns of Democratic candidates for the City Council of the District of Columbia whom they are currently supporting through financial contributions.[7] Without an exemption from the Commission such participation would clearly violate subsection 7324(a)(2) and subject these appellants to a possible penalty of at least 30 days suspension without pay and perhaps the loss of their jobs. See Hatch Act, § 7325, 5 U.S.C. § 7325 (1970); 5 C.F.R. §§ 733.131 to 733.137 (1976).

The Commission argues that since the appellants were prohibited by the Hatch Act from participating in partisan campaigns before it promulgated its exemption and continue to be prohibited afterwards, they have suffered no injury. This argument rests on an untenably narrow view of the Commission's decision. When the Commission decided to add the District to its exemption list it not only granted federal employees a limited benefit but also denied them a larger benefit. The Commission had received requests for an exemption covering partisan as well as independent candidates.[8] Moreover, after it had published its limited exemption, the Commission sent out at least two letters describing in detail why it had decided not to extend the exemption to partisan candidates.[9] The Commission's regulation thus embodied both a decision to exempt participation in the campaigns of independent candidates and a decision not to exempt participation in partisan campaigns.

By the Commission's logic, if it had decided not to add the District to the exemption list no one would have been able to seek judicial review of that decision since no one would be under any greater restriction than had no request for an exemption ever been made. We cannot accept such reasoning. The considered and deliberate decision of the Commission to refuse to exempt the appellants from the prohibitions of the Hatch Act is sufficient injury to meet the requirements for standing.[10]

---

**7.** The Hatch Act does not prohibit every kind of political activity, and the Civil Service Commission has declared by regulation that all employees are free to make a financial contribution to a political party. 5 C.F.R. § 733.111(a)(8) (1976).

**8.** The American Civil Liberties Union of the National Capital Area sent a letter to the General Counsel of the Civil Service Commission requesting that its exemption extend to support of partisan candidates. See Memorandum in Support of Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, Exhibit 2.

**9.** See *id.* Exhibit 6A and Exhibit 6B.

**10.** The Civil Service Commission also argues that because appellants substantive objection to the exemption regulation is that it is too

limited, they "have brought the wrong suit in the wrong forum . . . attempting to appeal from the wrong ruling." Brief for Appellees at 11. The Commission suggests that appellants must first petition the Commission for promulgation of a more expansive rule under section 4(e) of the Administrative Procedure Act, 5 U.S.C. § 553(e) (1970) and if that petition is denied then they can seek judicial review. *Id.* at 11–12. Appellants' argument, however, is that the Commission's action is subject to section 4(b) of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1970) which requires notice and comment *before* not after rulemaking. The right to petition for amendment of a rule granted by section 4(e) is not a substitute for, or alternative to, compliance with the requirements of section 4(b). *Wagner Elec. Corp. v. Volpe,* 466 F.2d 1013, 1020 (3d Cir. 1972).

The Commission's conclusion that appellants have not been injured also ignores the adverse impact on appellants' interest in the success of candidates representing a particular political viewpoint which results from the disparate treatment of different candidates in the same election. Success in any election depends not only on the strength of one's own campaign but also the strength of the opposition's. Appellants' interest in the success of a particular political point of view is injured when the Commission refuses to allow them to campaign for the candidate who represents that view, while permitting federal employees to work in the same election for independent candidates representing opposing political viewpoints.

The standing of the final group of appellants, Moore, Shackleton and Clarke, is unclear given the state of the record now before us. A candidate who is opposed by an independent candidate or who alleges facts showing the immediate threat of independent opposition would have standing to challenge the Commission's exemption regulation. That regulation would permit his opponent to enlist the active support of federal employees but deny him the opportunity for similar support. A candidate facing such a situation suffers an injury directly traceable to the Commission's action which gives him a concrete interest in the outcome of litigation challenging that action. The problem in this case is that none of the candidate-appellants allege that they face opposition from independent candidates.

■ Moore simply alleges that he was elected in 1974 to a two-year term as an at-large member of the District of Colum-

bia City Council and that he will probably seek public office again in the future. Shackleton and Clarke similarly only allege that they were elected to the City Council in 1974 and will probably seek public office in the future.[11] The failure to allege injury in detail may be simply a defect in the pleadings, however, and standing is not merely a pleadings issue since it can be assumed that justiciable actions will be processed in accordance with Rule 15 of the *Federal Rules of Civil Procedure* which allows liberal amendment to the pleadings. *See Ramer v. Saxbe*, 173 U.S.App.D.C. 83, 91, 522 F.2d 695, 703 (1975).

■ We may properly take judicial notice of certain facts with respect to the candidates for seats on the District of Columbia City Council [12] which to some extent fill in the generalized allegations of appellants' affidavits. In the 1976 elections there were three independent candidates running for the City Council—one each for the seat representing wards two, seven and eight respectively. None of these independents directly opposed any of the candidate-appellants in this case, however. Moore ran for an at-large seat in a field including Democratic, Statehood, Socialist Workers and U.S. Labor party candidates, but no independent candidates. Although there were independent candidates running in the ward races, neither Shackleton nor Clarke was up for reelection in 1976. Each was elected to a four year term in 1974 and will not face reelection until November 1978. None of the appellants can point to an existing or immediately threatened injury to their election campaigns from the exemption regulation's aid to independent candidates.[13]

11. Shackleton represents Ward three of the District of Columbia and Clarke represents Ward one. Both were elected to four year terms in 1974 and do not have to stand for re-election until November, 1978.

12. The facts we take notice of are all matters of public record which could be unquestionably demonstrated from easily accessible sources of indisputable accuracy. Such facts are clearly proper for judicial notice. *See* McCormack's Handbook of the Law of Evidence, § 330 (E. Cleary ed. 1972).

13. At oral argument appellants' counsel implied that Moore's Statehood party opponent would be free to enlist the active support of federal employees under the Commission's exemption. Although admittedly the Commission's regulations create some ambiguity on this point, we cannot find any reason, on the basis of the record now before us, to depart from the plain meaning of "independent candidate" as a candidate running solely on his or her own and not associated with any political party whatsoever.

Their standing rests solely on a forecast that in future elections they will face opposition from independent candidates who will benefit from the Commission's exemption.

In *O'Shea v. Littleton, supra,* 414 U.S. at 497, 94 S.Ct. at 676 the Supreme Court rejected a claim of standing by individuals who argued

> that *if* [they] proceed to violate an unchallenged law and *if* they are charged . . . and tried . . . before [the respondents], they will be subjected to the discriminatory practices that [respondents] are alleged to have followed.

*Id.* (Emphasis in original). The Court reasoned that the anticipated injury alleged in that claim was too dependent on "speculation and conjecture" to satisfy the standing requirement that the injury be immediate and real. *Id.; see Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

■ The situation of the appellants in this case is distinguishable from the facts of *O'Shea* in at least two respects, however. The anticipated injury in *O'Shea* depended on the violation of valid criminal laws. None of the petitioners had suggested that they expected to violate those laws and the Court was unwilling to assume that they would not conduct their future activities within the law. 414 U.S. at 497–98, 94 S.Ct. 669. The anticipated injury of the candidate appellants in this case depends on three contingencies: (1) appellants will seek reelection, (2) independent candidates will oppose appellants' reelection and (3) at least one federal employee will actively participate in the campaign of an independent candidate opposing appellants. None of

these contingencies is subject to a strong counter presumption similar to the counter presumption in *O'Shea* that valid laws will be obeyed. Contingency one hardly requires much speculation. Appellants have already alleged that they will "probably" seek elective office in the District in the future. To the extent that their use of "probably" requires speculation, it is more of a pleading problem than an inability to articulate a sufficient personal stake in this litigation. Similarly, contingency three requires little conjecture given the occurrence of contingency two. With the large number of federal employees in the District of Columbia area one may reasonably expect that an independent candidate would recruit at least one such employee as a campaign worker. Only contingency two—whether appellants will face opposition from independent candidates—requires any kind of speculation and conjecture comparable to that found fatal to the standing claim in *O'Shea.* This second contingency is less speculative than the one in *O'Shea* since there is no presumption against it, yet the situation confronting us is similar to *O'Shea* in that appellants have not alleged that they expect opposition from independent candidates.

We have taken judicial notice of the facts of the 1976 election which reveal that although there was no independent opposition for Moore's at-large seat, independent candidates did run against incumbents for the individual ward seats which were up for reelection. Of course past injury by itself cannot establish a present case or controversy regarding the prospective relief sought by appellants. *O'Shea, supra,* 414 U.S. at 495, 94 S.Ct. 669. Moreover, appel-

---

The Commission has not specifically defined the term "independent candidate" although its exemption from section 7324(a)(2) is specifically limited to participation in politics "as an independent candidate or on behalf of, or in opposition to, an independent candidate." 5 C.F.R. § 733.124(c)(1) (1976). Counsel for appellants apparently draws the implication that "independent candidate" includes a candidate of the Statehood Party from the Commission's definition of "nonpartisan election" as

> [a]n election at which none of the candidates is to be nominated or elected as repre-

senting a political party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected. . . .

*Id.* § 733.101(e)(1). To accept that implication we would have to read "independent" as including all candidates of political parties which did not field presidential candidates in the last election. Such a strained departure from the plain meaning of the word "independent" requires much more support than the record in this case offers.

lants cannot establish standing for themselves merely on a showing that other candidates for office in the District of Columbia are injured by the Commission's exemption. *See id.* at 494, 94 S.Ct. 669; *Golden v. Zwickler, supra,* 394 U.S. at 109–10, 89 S.Ct. 956. Past injury to others in so nearly identical situations as appellants, however, is evidence that there is a real and immediate threat of independent opposition to appellants' reelection. *See O'Shea, supra,* 414 U.S. at 496, 94 S.Ct. 669. We therefore are inclined to find standing for Moore, Shackleton and Clarke, but do so with two cautionary comments. First, since we have conclusively found standing for appellants who are current federal employees, our decision on the merits is not dependent on the standing of the candidate-appellants. Second, we urge that, at least as a matter of practice, the pleadings, affidavits and other supporting material submitted by plaintiffs should articulate their "injury in fact" with more particularity than the extremely brief and general allegations of the appellants in this case.

## B. *Ripeness*

The Civil Service Commission strongly contends that the Supreme Court's holding of nonjusticiability on allegedly similar facts in *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) is dispositive of this case. In *Mitchell* various federal employees sought an injunction against the Hatch Act's prohibition against participation in political campaigns and a declaratory judgment that the prohibition is unconstitutional. *Id.* at 81–82, 67 S.Ct. 556. The petitioners alleged that they desired to "perform any and all acts not prohibited by any provision of law other than the [Hatch Act] which constitute taking an active part in political management and political campaigns." [14] The Court characterized the threat from which petitioners sought relief as "a general threat by officials to enforce those laws which they are charged to administer," *id.* at 88, 67 S.Ct. at 564, and held that their claim was not justiciable, but only an attempt to get "advisory opinions upon broad claims of rights." *Id.* at 89, 67 S.Ct. at 564.

The posture of the legal issues presented by appellants in this case is markedly different from that in *Mitchell,* and *Mitchell's* view of justiciability must be evaluated in light of subsequent case law development. The federal employees in *Mitchell* and appellants here both may have been motivated to bring suit by a desire to actively participate in political campaigns. Ripeness is not a question of litigants' motives; it depends instead on whether the

---

**14.** *Mitchell, supra,* 330 U.S. at 82–83 n.11, 67 S.Ct. at 561 n.11. The affidavits presented by plaintiffs, insofar as it applied to all parties, stated:

At this time, when the fate of the entire world is in the balance, I believe it is not only proper but an obligation for all citizens to participate actively in the making of the vital political decisions on which the success of the war and the permanence of the peace to follow so largely depend. For the purpose of participating in the making of these decisions it is my earnest desire to engage actively in political management and political campaigns. I wish to engage in such activity upon my own time, as a private citizen.

I wish to engage in such activities on behalf of those candidates for public office who I believe will best serve the needs of this country and with the object of persuading others of the correctness of my judgments and of electing the candidates of my choice. This objective I wish to pursue by all proper means such as engaging in discussion, by speeches to conventions, rallies, and other assemblages, by publicizing my views in letters and articles for publication in newspapers and other periodicals, by aiding in the campaign of candidates for political office by posting banners and posters in public places, by distributing leaflets, by "ringing doorbells", by addressing campaign literature, and by doing any and all acts of like character reasonably designed to assist in the election of candidates I favor.

I desire to engage in these activities freely, openly, and without concealment. However, I understand that the second sentence of Section 9(a) of the Hatch Act and the Rules of the C.S.C. provide that if I engage in this activity, the Civil Service Commission will order that I be dismissed from federal employment. Such deprivation of my job in the federal government would be a source of immediate and serious financial loss and other injury to me.

*Id.* at 87 n.18, 67 S.Ct. at 562 n.18.

issues presented for decision are within the competence of a federal court.

In *Mitchell* the litigants sought a declaration that, if they were to engage in a broad ranging number of activities,[15] the Civil Service Commission could not constitutionally take action against them under the Hatch Act. *See Mitchell, supra*, 330 U.S. at 81–82, 67 S.Ct. 556. Those litigants who were dismissed from that suit for failure to present a justiciable case did not claim that they had violated the Hatch Act or allege in any other way that the Commission was threatening to take action against them.[16] In that posture, the Court characterized their objections as "really an attack on the political expediency of the Hatch Act . . [and] beyond the competence of [the] courts [to decide]" *Id.* at 89, 67 S.Ct. at 564.

The appellants in this case, in contrast, do not seek a declaration that their intended political activity cannot be prohibited by the Hatch Act. They do not seek prior protection from some future action by the Commission,[17] but challenge the procedural and substantive validity of a regulation already promulgated. The legal issues which they present to this court are whether that particular rule was issued pursuant to prop-

er procedures and whether the Commission has the statutory and constitutional authority to issue it. Far from the generalized and abstract questions of political expediency found nonjusticiable in *Mitchell*, the issues in this case are concrete legal questions presented in the context of an actual proceeding by the Commission.

The Civil Service Commission also argues that a decision on the issues raised by this suit should await an actual enforcement action by the Commission which would result in a reviewable final order.[18] We find several errors in this reasoning. A partisan candidate for elective office who is not himself a federal employee is not subject to the Commission's authority. He may well be injured by the Commission's determination to allow federal employees to work for an independent opponent but not for him, yet there is no way he can ensure that determination will be challenged. He himself cannot violate the Hatch Act and force the Commission to bring an enforcement action against him. Unless he can come to court in the present posture of this case he may well be left with an illegal injury but no forum in which to seek redress.[19]

15. *See* note 14 *supra*.

16. One litigant alleged that he had been charged with political activity by the Commission and that an order for his removal from his position had been adopted subject to his right to present counter evidence. *Mitchell, supra*, 330 U.S. at 91–92, 67 S.Ct. 556. The Court held that his claim was justiciable and proceeded to consider the constitutional arguments relevant to his factual situation. *Id.*

17. The continuing validity of *Mitchell's* holding that the claims of plaintiffs who have not violated the Hatch Act and therefore are not immediately subject to disciplinary action by the Civil Service Commission are not justiciable seems doubtful in light of *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). In *Letter Carriers* the Supreme Court reaffirmed the constitutionality of the Hatch Act, but did so in a suit brought by plaintiffs who

alleged that the Civil Service Commission was enforcing, or threatening to enforce, the Hatch Act's prohibition against active participation in political management or political campaigns with respect to certain defined activity in which [they] desired to engage.

*Letter Carriers, supra*, 413 U.S. at 551, 93 S.Ct. at 2883 (footnote omitted). In a footnote to its opinion the Court set out the plaintiffs' statements as to the activities they desired to engage in, which reveal that only one plaintiff had violated the act and none were the subject of a Civil Service Commission enforcement action. *Id.* at 551–53 n.3, 93 S.Ct. 2880. The Court took no special note of this distinction and did not, as the *Mitchell* Court explicitly did, restrict its discussion of the merits to only the issues raised by the factual circumstances of the plaintiff who had violated the Act.

18. This argument would have much greater force if appellants here sought to challenge the Hatch Act itself rather than simply a regulation issued by the Commission under that Act. The issuance of regulations by an administrator charged with enforcement may itself be deemed a sufficient threat of enforcement. *See* K. Davis, Administrative Law Treatise, § 21.06, at 150 (1958).

19. In *CBS v. United States*, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), the Supreme Court granted a network "pre-enforcement" review of a rule of the FCC which stated that the

Moreover, even if an employee covered by the Act does force the Commission into an enforcement action, it is doubtful that the issues raised by this suit would be relevant in any review of the Commission's determination that an employee violated the Hatch Act. This suit does not challenge the Act, but only a rulemaking decision of the Commission. It would be no defense to a violation of the Act to argue that the Commission's exemption regulation was not issued according to proper procedures or that it unconstitutionally discriminates between employees of different political persuasion. Whether or not other activity was properly or improperly exempted from the Act's prohibitions is simply not relevant to a review of a penalty for activity clearly in violation of the statute and not exempt under any regulation.[20]

Finally, we note that modern case law since *Mitchell* reflects a greater judicial willingness to aid litigants faced with the necessity of risking substantial harm in order to challenge the validity of governmental action. As early as 1952, in *Adler v. Board of Education*, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952) the Supreme Court ignored the ripeness rule of *Mitchell*, if it did not actually overrule it *sub silentio*. Adler and three other teachers in New York City Schools challenged the validity of a complicated statutory and regulatory scheme of the State of New York prohibiting anyone who engaged in certain proscribed speech or conduct from working in the public school system. The teachers did not allege that they had engaged in or intended to engage in any proscribed activity. They did not even allege that they were deterred from supporting causes or joining organizations by fear of the law's interdict. *See id.* at 504, 72 S.Ct. 380 (Frankfurter, J., dissenting). Although Justice Frankfurter noted in dissent that "[t]he allegations in the present action fall short of those found insufficient in the *Mitchell* case" *id.*, the majority did not discuss ripeness and proceeded directly to a decision on the merits.

In 1970 Professor Kenneth Culp Davis noted that not a single decision since 1958 had adopted the same attitude towards ripeness as *Mitchell*. *See* K. Davis, Administrative Law Treatise, § 21.00, at 670 (Supp.1970). Moreover three years before, in 1967, the Supreme Court decided a trio of

FCC would deny license renewals to broadcast stations whose contracts with networks contained certain proscribed provisions. The Commission argued that the network should be left to seek relief by intervention in an actual license renewal proceeding and offered to allow a station to litigate the validity of the regulation without running the risk of losing its license. The Court disagreed, finding that the case-by-case remedy of intervention could not protect the network from substantial damage to its business—cancellation of contracts by affiliated stations who could not be persuaded to assume the initiative in challenging the regulations. *Id.* at 422–24, 62 S.Ct. 1194.

In the case before us it is not at all clear that candidates would have any right to intervene in a Civil Service proceeding against a federal employee who allegedly violated the Hatch Act by participating in their campaigns. Moreover, the Civil Service Commission has made no offer to permit a federal employee to violate its regulation for purposes of litigating its validity and yet incur no penalty if he afterwards conforms his conduct to the regulation. Finally, the candidates in this case, like the network in CBS, face substantial injury because those subject to an allegedly invalid regulation choose to comply with it rather than to risk the potential adverse outcome of litigation.

**20.** As the Commission notes in its brief, if a court finds that the exemption regulation is invalid, the only remedy available is a declaration that the regulation has no effect. The court has no power on its own to expand the scope of the regulation and declare an exemption from the Hatch Act for all political activity in the District of Columbia. The Commission, however, erroneously reasons that since appellants prefer such an expanded exemption and the court cannot grant it, they do not have standing. If the appellants are injured by the Commission's exemption decision they have standing. *See* text at 6–13. A court can remedy their injury by holding the contested regulation invalid either because, as we hold, the proper procedures were not followed or, as we decline to hold at this time, the Constitution limits the Commission to a choice of exempting all political activity or exempting none. Simply because appellants would prefer that the Commission choose to exempt all activity is no reason to deny them a chance to challenge the procedural and substantive validity of its choice to exempt only some.

**1152**

cases which have served as the basis of the modern law of ripeness. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Association*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). In *Abbott* and *Gardner v. Toilet Goods* the Court granted what it termed "pre-enforcement" review of labelling regulations of the Food and Drug Administration after considering the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. The Court developed its two-fold analysis from the basic rationale of the ripeness doctrine:

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way . . ..

*Abbott, supra*, 387 U.S. at 148, 87 S.Ct. at 1515.

 Appellants' complaint against the Civil Service Commission's exemption regulation is not an abstract policy dispute. They themselves, as candidates, or the candidates they support have been and will be directly disadvantaged by the Commission's decision to restrict its exemption to independent candidates. If this suit is dismissed, their only avenue for redress of this disadvantage is to violate the Hatch Act and run the risk of losing their jobs.[21] Their suit does not seek court review of an administrative policy in its formative stage. The Commission's exemption regulation embodies a policy decision which has been fully formalized. By its own inaction the Commission has indicated that it does not intend

to conduct further administrative proceedings to refine or adjust its exemption policy. Indeed, in this suit it opposes the notice and comment proceedings which appellants seek to initiate. We therefore find that the conclusion of the Supreme Court in *Abbott* applies with full force to the case now before us:

> Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance. . . .

*Id.* at 153, 87 S.Ct. at 1518.

## II. NOTICE AND COMMENT PROCEEDINGS REQUIRED

 Appellants charge that the Civil Service Commission violated the requirements of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970), when it extended its exemption regulation to the District of Columbia without conducting notice and comment proceedings. Section 4(b) and (c) require an agency to publish a general notice of proposed rulemaking in the Federal Register and to afford interested persons an opportunity to submit comments. Administrative Procedure Act, 5 U.S.C. §§ 553(b) and (c) (1970). Although the Civil Service Commission did not comply with the notice and comment procedures of section 4,[22] the district court granted the Commission's motion for summary judgment apparently on the grounds that its regulation is an interpretative rule and, as such, within the exemption from notice

---

**21.** Of course only those appellants who are federal employees face this dilemma directly. The candidate appellants must convince their supporters who are federal employees to violate the Hatch Act to overcome the advantage of their independent opposition under the Commission's exemption regulation.

**22.** On May 18, 1974 the Civil Service Commission announced, by press release, that the District of Columbia had been designated an exempt locality under 5 C.F.R. § 733.124. Nearly two weeks later on May 30, 1974 the Commission published a notice of amendment to section 733.124 in the *Federal Register* with an effective date of May 16, 1974. 39 Fed.Reg. 18761 (1974).

and comment proceedings of section 4(b)(3)(A).[23]

■ We find that the Commission's action must be classified as legislative [24] rather than interpretative rulemaking. Consequently it is subject to the notice and comment requirements of section 4. Subsection 7327(b) of the Hatch Act delegates authority to the Commission to issue regulations exempting government employees within certain statutorily defined areas from the prohibitions of the Act.[25] When it added the District to its exemption regulation the Commission clearly intended to exercise that authority and promulgate a rule with the full force of law. Whether or not the District of Columbia is to be exempt from Hatch Act prohibitions is not a matter requiring either clarification of statutory language or a public indication of how the

Commission will exercise a discretionary power. If the Commission issues an exemption which is within the authority of subsection 7327(b) and follows the proper procedure, that exemption is as binding on a court as if it were part of the statute. A court is not free to disregard the Commission's decision and an employee charged with violation of the Hatch Act cannot argue that the Commission's decision not to exempt the conduct he has engaged in was only "interpretative" and should be replaced by a broader exemption shaped by the courts.

■ When an agency seeks to exercise such legislative rulemaking authority it must follow the notice and comment procedures of section 4 of the Administrative

**23.** 5 U.S.C. § 553(b)(3)(A) (1970). The court's order literally reads: "defendants' motion for summary judgment . . . is hereby granted . . . on the authority of 5 U.S.C. § 533(a) relating to interpretive rulings." There is no section 533(a) and the explicit statutory exemption for interpretative rules is found in section 553(b). The Commission argues that the district court did not restrict itself to section 553(b), but relied on all the possible exceptions in section 553. Thus the Commission reasons that if its action is not an interpretative rule, it is nonetheless exempt from notice and comment proceedings under either section 553(a)(2) concerning rules relating to "agency management or personnel" or section 553(d) covering a rule which grants an exemption or relieves a restriction. Even if we were to accept the Commission's reading, of the district court's order, we could not hold that section 553(a)(2) or (d) are applicable to its decision to exempt local elections in the District of Columbia from some of the prohibitions of the Hatch Act. Section 553(a)(2) must be narrowly construed, *City of New York v. Diamond*, 379 F.Supp. 503, 517 (S.D.N.Y.1974), and although the Commission's regulation is only directed at government personnel it does not fall within section 553(a)(2) because outside individuals are substantially affected. *See Seaboard World Airlines, Inc. v. Gronouski*, 230 F.Supp. 44, 46 (D.D.C.1964). Section 553(d)(1) only provides an exception to the requirement that a proposed rule be published not less than 30 days before its effective date. It does not free an agency from its obligation under section 553(c) to provide an opportunity for comment and to respond to the issues raised by comments.

**24.** The term "legislative rule" is used in this opinion to refer to rules issued pursuant to legislatively-delegated power to make rules having the force of law that must be promulgated under the procedures of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970). The parties have framed their arguments in terms of whether the Civil Service Commission's exemption regulation is a "substantive" rather than interpretative rule. Interpretative rules may be substantive in the sense of addressing a substantive rather than procedural issue of law and legislative rules may be procedural. The relevant distinction between legislative and interpretative or any other non-legislative rules is not the nature of the questions they address but the authority and intent with which they are issued and the resulting effect on the power of a court to depart from the decision embodied in the rule. See Koch, *Public Procedures for the Promulgation of Interpretative Rules and General Statements of Policy*, 64 Geo.L.J. 1047, 1047–49 & nn. 4–9 (1976).

**25.** The Supreme Court's finding in *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 571–72, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) that Congress did not intend the Commission to have legislative rulemaking authority in the sense of fashioning a more expansive definition of prohibited conduct is not inconsistent with our finding that under subsection 7327(b) the Commission can promulgate rules with the force of law which narrow the definition of prohibited conduct.

**1154**

Procedure Act.[26] The Commission's failure to comply with those requirements when it promulgated the exemption regulation at issue in this case renders that regulation invalid.[27] *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 763–66, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

## III. SCOPE OF THE CIVIL SERVICE COMMISSION'S EXEMPTION AUTHORITY

The question was raised at oral argument whether the Civil Service Commission has established that it has the necessary statutory authority to exempt elections in the District of Columbia from prohibitions of the Hatch Act. Although no definite answer to this question can be given in view of the inadequacy of the current record, the interests of judicial efficiency persuade us to indicate the issues which should be ad-

dressed in any future rulemaking with respect to a Hatch Act exemption for the District of Columbia.

 The Commission can only exempt employees residing in a particular municipality or political subdivision when:

the municipality or political subdivision is in Maryland or Virginia and in the immediate vicinity of the District of Columbia, or is a municipality in which the majority of voters are employed by the Government of the United States. . . .

Hatch Act, 5 U.S.C. § 7327(b)(1) (1970). The District of Columbia cannot qualify for an exemption under the first alternative in subsection 7327(b)(1). Although there can be no dispute that it is "in the immediate vicinity of the District of Columbia," it is equally certain that it is not in the states of Maryland or Virginia. The legislative his-

**26.** Appellants also argue that the Commission's exemption regulation is a "substantive" or legislative rule and therefore subject to notice and comment requirements because it "substantially affects the rights of persons subject to agency regulations" citing *Pickus v. United States Board of Parole*, 165 U.S.App.D.C. 284, 289–290, 507 F.2d 1107, 1112–13 (1974). The classification of a rule as legislative or interpretative has a significant impact on the procedures required for its issuance, but it is a question distinct from the problem of proper rulemaking procedure. An agency can only issue legislative rules if it has been delegated that power by Congress. Without that authority all rules an agency issues are necessarily interpretative regardless of their impact. An agency without legislative rulemaking authority may issue interpretative rules which have such a significant impact that courts should require the agency to involve interested parties in its rulemaking process. *E. g. Pickus v. United States Board of Parole, supra*; *see* Koch, *supra* note 24, at 1059. However, it is both imprudent and unnecessary for a court to allow its conviction that an agency should permit public participation in the promulgation of a particular rule to influence its decision on whether the rule is legislative or interpretative. Classification of a rule as legislative has implications beyond the conclusion that section 553 notice and comment procedures apply. Legislative rules have the full force of law and are binding on a court subject only to review under an arbitrary and capricious standard. Interpretative rules do not have the force of law and even though courts often defer to an agency's interpretative rule they are always free to choose otherwise. A court should not inadvertently grant an agen-

cy rule the binding effect of a legislative rule simply for the purpose of avoiding an exemption from the notice and comment procedures of section 553. *See* K. Davis, *Administrative Law of the Seventies* § 5.03–1, at 150–52 (1976). Even though a rule is exempt from the literal requirements of section 553, courts can require some sort of public participation in its issuance in the name of fairness and improved agency decision making. *See id.* §§ 6.01–7 to –8; Koch, *supra* at 1059–71. *But see* K. Davis, *supra* § 6.01–9; Koch, *supra* at 1071–78.

**27.** The Civil Service Commission did in fact provide, by letters, a rather detailed explanation of why it declined to extend its exemption beyond independent candidates. Memorandum in Support of Defendants' Motion to Dismiss or for Summary Judgment, Exhibits 6A and 6B. Nothing in our opinion in this case is meant to in any way imply that this explanation was inadequate. *See also Democratic State Central Comm. v. Andolsek*, 249 F.Supp. 1009, 1018–20 (D.Md.1966). Nevertheless, neither its good faith nor the adequacy of its response to the requests for a broader exemption can excuse the Commission from compliance with the notice and comment procedures of section 4. Had section 4 been complied with, other parties may have responded with comments and they and the appellants could have built a record for a subsequent challenge to the validity of the Commission's action under section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706 (1970). *Cf. Rodway v. Department of Agriculture*, 168 U.S.App.D.C. 387, 395, 514 F.2d 809, 817 (1975).

tory of this first alternative clearly indicates that it was proposed to restrict the Civil Service Commission's exemption authority to areas adjacent to the District. *See* 86 Cong.Rec. 2976–78 (1940) (remarks of Senators Byrd and O'Mahoney). Admittedly the failure to include areas within the District may well have been due to the fact that there were no elective positions within the District government in 1940 when the Commission was given its exemption authority.[28] The literal language of the first alternative in subsection 7327(b)(1), however, clearly does not include the District, and although a court should interpret the meaning of statutory language in light of the intent of its drafters, we cannot rewrite the statute to compensate for unforeseen circumstances. That power belongs to the legislature alone.

If the Civil Service Commission does have power to exempt elections in the District of Columbia from Hatch Act prohibitions, it must be on the basis of the second alternative of subsection 7327(b)(1) that the District "is a municipality in which the majority of voters are employed by the Government of the United States. . . ." Hatch Act, 5 U.S.C. § 7327(b)(1) (1970). At oral argument two questions were raised with respect to this alternative: 1) Should employees of the District of Columbia be considered "employed by the Government of the United States" for purposes of determining whether a majority of the voters who reside in the District are so employed; and 2) Does the statutorily-required majority refer to eligible voters, registered voters or actual voters, and by what method may the Commission make its finding that a majority thereof are employed by the Government.

■■■ Employees of the District of Columbia are not treated as employees of the United States for all purposes. *See Bradshaw v. United States*, 143 U.S.App.D.C. 344, 351–353, 443 F.2d 759, 766–68 (1971). The legislative history of the Hatch Act, however, indicates that for purposes of subsection 7327(b)(1) they should be considered "employed by the Government of the United States." The Commission's exemption authority was added to the Hatch Act as an amendment to a bill which extended the prohibitions of the Act to District employees by providing that for purposes of the Hatch Act "persons employed in the government of the District of Columbia shall be deemed to be employed in the executive branch of the Government of the United States. . . ." Act of July 19, 1940, ch. 640 § 4, 54 Stat. 771 (adding section 14 to Act of August 2, 1939); 86 Cong.Rec. 2341 (1940) (remarks of Senator Hatch explaining extension to D.C. employees); *id.* at 2981 (remarks of Senator Schwellenbach explaining amendment restricting Commission's exemption authority). Thus at the time of its enactment the phrase "employed by the Government of the United States" clearly included employees of the District of Columbia. There has been no substantive change in the Commission's exemption authority since that time.[29]

---

**28.** In 1940 the District of Columbia was a municipal corporation governed by three Commissioners appointed by the President of the United States. Act of June 11, 1878, ch. 180, 20 Stat. 102; *see* 1973 D.C.Code Legislative and Administrative Service 439. *See generally id.* at 438–42, 457–69.

**29.** In 1966 title 5 of the *United States Code* was recodified and enacted into positive law. Act of September 6, 1966, Pub.L.No.89–554, 80 Stat. 378. The language of section 14 of the Hatch Act which extended the Act to District employees by providing that they were to be considered as employed by the Government of the United States was dropped. In lieu thereof the prohibitory section of the law was changed to read

An employee in an Executive agency or an individual employed by the government of the District of Columbia may not—

(2) take an active part in political management or in political campaigns.

*Id.* § 7324(a)(2), 5 U.S.C. § 7324(a)(2) (1970). At the same time the recodification failed to change the language of the Commission's exemption authority which still reads: "the majority of voters are employed by the Government of the United States". *Id.* § 7327(b)(1), 5 U.S.C. § 7327(b)(1) (1970).

The committee reports do not indicate any intention to change the law with respect to the Commission's exemption power. *See* S.Rep. No.1380, 89th Cong., 2d Sess. 152 (1966); H.R. Rep.No.901, 89th Cong., 2d Sess. 130–31

We therefore conclude that employees of the District of Columbia should be counted in determining whether the Commission may exempt the District under subsection 7327(b)(1).

Unfortunately the legislative history of subsection 7327(b)(1) is far less enlightening on what the drafters meant by "majority of voters". The Commission's exemption authority was not part of the legislation as originally proposed. It was added to the Act by amendment during the final hours of consideration in the Senate, see 86 Cong. Rec. 2976–81 (1940), and both the House and Senate Committee Reports only restate the legislative language of the exemption provision without explanation.

As originally proposed by Senator Byrd the amendment would have allowed the Civil Service Commission to grant an exemption whenever it determined that by reason of special or unusual circumstances an exemption would be in the domestic interests of persons subject to the Act. *Id.* at 2976. In debate Senator O'Mahoney voiced his concern that this language conferred too broad an exemption power on the Commission and, at his suggestion, the words "in the immediate vicinity of the National Capital, in the States of Virginia and Maryland" were added. *Id.* at 2977. Senator Schwellenbach then proposed the addition of language to include areas where a majority of voters are employed by the government of the United States, to meet the problem of Bremerton, Washington where a majority of the citizens were employed by or were members of the family of someone employed by the Puget Sound Navy Yard. *Id.* at 2981 (remarks of Senator Schwellenbach). Aside from comments that Senator Schwellenbach's proposal would also cover Norris, Tennessee where a majority of the voters were employed by

the Tennessee Valley Authority and all other similar situations there was no other debate. The proposal was accepted by Senator Byrd as a modification to his amendment which in turn was agreed to, as modified, by the entire Senate. *Id.* The House did not change the Senate's language with respect to this provision, and the House debates offer no clarification of the phrase "majority of voters".[30]

The Civil Service Commission has apparently decided that this "majority of voters" standard should be read as requiring a demonstration that a majority of the registered voters are government employees. See Record, Affidavit of General Counsel of Civil Service Commission; 119 Cong.Rec. 42458 (1973) (remarks of Senator Eagleton explaining the information required by the Commission in an application for exemption). We see no reason to reject this interpretation of subsection 7327(b)(1), but we do question the evidentiary support for the Commission's conclusion that in fact a majority of the registered voters in the District of Columbia are government employees.

 The only quantitative data in the record relevant to this issue is contained in a letter from Fred D. Wilkes of the American Federation of State, County and Municipal Employees to the Civil Service Commission requesting an exemption for the District of Columbia. Memorandum in Support of Defendants' Motion to Dismiss or for Summary Judgment, Exhibit 1. By means of a twelve-step estimation process, Wilkes concludes that 43 per cent of the registered voters of the District of Columbia are employed by either the District or federal governments. *Id.* Although he does not explicitly reject this estimate,

---

(1966). In fact the preface to the House report explicitly states that "there are no substantive changes made by this bill enacting title 5 into law", H.R.Rep.No.901, *supra* at 3, even where it was necessary to change language to restate the statute in one comprehensive title. *Id.* at 2. See also Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 227, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957).

**30.** The only discussion of the Commission's exemption authority in the House debates centered around two amendments proposing to make the exemptions self-executing rather than dependent on a discretionary decision by the Civil Service Commission. See 86 Cong. Rec. 9460–63 (1940). Both amendments were defeated. See id., at 9461, 9463.

Wilkes apparently intends to imply through two footnotes in his letter that it is significantly below the actual figure. He notes that his formula relies on a figure for total government employment which does not include Central Intelligence Agency and National Security Agency employees, and estimates the percentage of government employees registered to vote on the basis of the registration percentage for the entire voting age population which he assumes is significantly lower than the percentage of fully employed persons who are registered to vote. Wilkes offers no quantitative factor by which to adjust the estimate of 43 per cent to make up for the conservative bias of his estimation technique and we would be unwilling to assume that his estimate is necessarily low by at least seven percentage points.

We could not uphold a claim of Commission authority to act under subsection 7327(b)(1) based on the tenuous statistical evidence presented in this case. Of course the Commission is not required to conduct a name-by-name inquiry into the employment status of every registered voter where that data is not readily available, but neither can it rely on the unsupported assumption that if an estimating formula yields an approximate figure of 43 per cent then the actual figure must necessarily be more than 50 per cent. The fact that a majority of voters in an area are employed by the Government must be established by more satisfactory statistical proof.

## IV. CONCLUSION

Appellants have standing to challenge the Civil Service Commission's decision to exempt local elections in the District of Columbia from the prohibitions of the Hatch Act. Their suit is not barred by whatever remains of the ripeness rule of *United Public Workers v. Mitchell, supra*, since the issues they raise are fit for judicial determination and after weighing the respective hardships we find no reason to delay consideration of their claim. The Commission's exemption regulation for the District is an attempt at legislative rulemaking and its failure to comply with notice and comment procedures of the Administrative Procedure Act for such rulemaking renders the regulation invalid. We therefore reverse the district court's judgment in favor of the Commission and remand this case for entry of a judgment declaring the Commission's exemption regulation for the District of Columbia invalid. We also note that if the Commission decides to repromulgate this exemption following the proper procedures, it should develop stronger support for a finding that a majority of the voters in the District are employed by the government of the United States than the tenuous statistical inferences presented in the record of this case.

Finally, we wish to clarify any question as to the potential retroactive effect of our decision. Although we hold that the Commission's exemption regulation for local elections of the District of Columbia is invalid, any individual who relied on that exemption prior to the date of our decision can properly assert it as a defense to a charge that he otherwise violated the Hatch Act. *Cf. Pickus v. United States Board of Parole*, 165 U.S.App.D.C. 284, 291, 507 F.2d 1107, 1114 (1974).

*Reversed and Remanded.*

MacKINNON, Circuit Judge, concurring:

I concur in the foregoing opinion but with respect to the interpretation of the first clause of 5 U.S.C. § 7327(b)(1) (1975) as excluding the District of Columbia,[1] I would emphasize that this conclusion results from the specific language of the statute and is not in any way dependent on "legislative history."

While the provision, "in the immediate vicinity of the District of Columbia," taken alone, might be said to include the actual area of the District of Columbia because a definite area might by some be said to be within its own vicinity, it is awkward to convey such intent in that manner and the full context of the statement makes it clear

---

1. Majority op., p. —— of 180 U.S.App.D.C., p. 1154 of 554 F.2d.

that Congress did not so intend. Had Congress intended to include the District of Columbia because of its proximity to the Nation's Capital, it would have merely designated it by name,[2] but it did not do so. Instead the express wording of the statute clearly indicates that Congress intended to exclude the District of Columbia because it provided in the Act that the

> municipality or political subdivision [should be] in Maryland or Virginia *and* in the immediate vicinity of the District of Columbia. . . .

Since no part of the District of Columbia is in either "Maryland or Virginia," the District of Columbia is clearly excluded and it is immaterial whether one considers the District of Columbia to be within its own vicinity. Also, since the statute is clear there is no need to resort to legislative history that confirms the above interpretation.[3]

Nothing in this opinion is intended to convey the impression that the District of Columbia might be excluded if it is found that a majority of voters are employed by the government of the United States.[4]

The interpretation of the phrase "majority of voters" in the second clause of section 7327(b)(1) to mean "majority of registered voters" can also be upheld simply on the internal logic of the statute's phraseology. This exception is addressed to situations where federal employees dominate an electorate. To base the determination of dominance on some standard other than fully eligible *registered* voters could defeat the logic of the section, where an area predominates in federal employees, but, perhaps due to apathy engendered by their being barred from taking part in the campaigns, less than a majority of the registered voters are federal employees. Thus, any interpretation other than "registered

voters" would cut against the plain object of the exception.[5]

---

2. As it did in specifically designating municipalities in Maryland and Virginia.

3. Majority op., p. —— of 180 U.S.App.D.C., p. 1154 of 554 F.2d. 86 Cong.Rec. 2976–78 (1940).

4. At the time of the 1976 Presidential election there were 262,887 registered voters in the District of Columbia. 171,469 voted.

5. If registration was not required for voting a different interpretation would be required. The sense of the section is to refer to any fully eligible voter.