Opinion for the Court filed by Circuit Judge WALD.
Dissenting opinion filed by Circuit Judge WRIGHT.
WALD, Circuit Judge:
Appellants, Daryl Stewart and Audrey Herbst, brought this action to challenge the Bureau of Prisons’ (“BOP”) policy of refusing to consider for jobs within correctional facilities any applicant who is over thirty-four years of age.[1] Appellants contend that BOP’s policy (1) violates the Age Discrimination in Employment Act, 29 U.S.C. § 633a (“ADEA”); (2) is arbitrary and capricious and thus invalid under the Administrative Procedure Act (“APA”), 5 U.S.C. § 706(2)(A); and (3) was adopted in contravention of the notice and comment rulemaking requirement of the APA, 5 U.S.C. § 553. Appellants also argue that the district court erred by remanding this case to the Office of Personnel Management (“OPM”) for a detailed review of the propriety of BOP’s policy with respect to each job classification in prison facilities. For the reasons set forth below, we affirm the district court’s order upholding BOP’s maximum age policy and granting summary judgment to appellees.
I. BACKGROUND
A. Statutory Authority for Maximum Age Policies
In 1974, Congress enacted Public Law 93-350, 88 Stat. 355, a major piece of legislation designed to enhance the “youth and vigor” of federal law enforcement personnel.[2] Together with provisions on mandatory retirement[3] and incentives for early retirement,[4] Public Law 93-350 provided agencies employing law enforcement officers with authority to set maximum ages *488 for appointment to law enforcement positions. See 5 U.S.C. § 3307(d).[5] To set such a maximum age rule, an agency first had to receive the concurrence of the Civil Service Commission (“Commission”)[6] in its determination that the relevant employees are law enforcement officers. Under 5 U.S.C. § 8331(20), the term “law enforcement officer” is defined for all of Public Law 93-350’s hiring and retirement provisions to include employees at the Bureau of Prisons:
whose duties in connection with individuals in detention suspected or convicted of offenses against the criminal laws of the United States or of the District of Columbia or offenses against the punitive articles of the Uniformed Code of Military Justice (chapter 47 of title 10) require frequent ... direct contact with these individuals in their detention, direction, supervision, inspection, training, employment, care, transportation, or rehabilitation[.]
5 U.S.C. § 8331(20).[7] The remaining steps for establishing a maximum age rule for law enforcement officers are set out in 5 U.S.C. § 3307(d). Under that section, the agency employing the law enforcement officers must initiate a proposed maximum age rule. Finally, section 3307(d) provides that a maximum age rule must be concurred in by an agency designated by the President. Subsequent executive orders assigned this concurrence responsibility to the Commission[8] and, following Reorganization Plan No. 2 of 1978,[9] to its successor, OPM.[10]
B. Establishment of BOP’s Maximum Age Policy
Following passage of Public Law 93-350, the Department of Justice (“Department”) sought the concurrence of the Commission in its determination that all BOP employees working within correctional facilities are “law enforcement officers” within the meaning of 5 U.S.C. § 8331(20). In its letter to the Commission, the Department explained that BOP employees working within correctional facilities had almost invariably received increased pensions for hazardous duty under prior law, which had required the Commission to make a case by case determination of whether the hazards faced by an employee warranted an enhanced retirement annuity.[11] The Department offered to provide more detailed information to the Commission.[12] The Corn- *489 mission, however, apparently agreed that further documentation was unnecessary. On March 12, 1975, it concurred in the Department’s determination,[13] thereby bringing BOP’s employees in correctional facilities within the scope of Public Law 93-350’s retirement provisions as well as its provision for setting maximum age requirements.
Meanwhile, the Department had participated in meetings with the Commission regarding procedures and standards for setting maximum age entry requirements.[14] On April 28, 1975, the Attorney General, Edward H. Levi, formally requested that the maximum age for appointment to law enforcement positions within its agency be set at the date immediately preceding an individual’s 35th birthday.[15] The Attorney General proposed that exceptions to this policy be carved out only for especially qualified individuals, skill shortages and in cases where tentative selectees reach their thirty-fifth birthday during clearance and processing requirements.[16] On June 4, 1975, the Commission concurred in this proposal.[17]
C. Proceedings Below
In the fall of 1976, appellant Stewart telephoned the Federal Correctional Institution for Women in Alderson, West Virginia, to inquire about available jobs. After indicating that she was over 35 years of age,[18] she was told that she was ineligible for any job within that institution. Subsequently, Stewart sent a letter to the Commission, which at that time had responsibility for administering the ADEA, 29 U.S.C. § 633a, inquiring as to the legality of BOP’s policy. Jeanne Monk, ADEA Program Coordinator for the Commission, answered Stewart’s letter, explaining that the statute authorizing maximum age entry rules for law enforcement officers is an exception to the ADEA and that, therefore, BOP’s policy did not constitute arbitrary age discrimination as prohibited by the ADEA.[19] On March 10, 1977, Stewart brought this suit in district court alleging that the Attorney General, the Director of the Bureau of Prisons, and the Chairman and members of the Civil Service Commission had adopted the maximum age policy in violation of the ADEA, the APA and the equal protection guaran *490 tee of the Fifth Amendment.[20] Stewart sought to represent all individuals between the ages óf 40 and .65 who had applied or would apply for employment in BOP correctional facilities. After the district court denied Stewart’s motion for class certification, see Stewart v. Bell, No. 77-0398 (D.D.C. Nov. 7, 1977); J.A. 2, appellant Herbst moved to intervene in this action. Herbst had sought employment as a clerk-typist at the United States Penitentiary in Lewisburg, Pennsylvania. As with Stewart, Herbst had been told that she was ineligible for employment because she was over thirty-five years of age. The district court granted Herbst’s motion to intervene.[21] Stewart v. Bell, No. 77-0398 (D.D.C.Nov. 21, 1977).
On June 27, 1978, appellants moved for partial summary judgment on the issue of the legality of BOP’s maximum age policy, and appellees moved for summary judgment as to the entire case.[22] In an opinion filed on March 26, 1979, the district court denied both these motions. J.A. 315. The district court first rejected appellants’ argument that BOP’s policy violates the ADEA, concluding that the statute that authorizes maximum age rules for law enforcement officers, 5 U.S.C. § 3307(d), constitutes an exception to the ADEA. Proceeding to the contention that BOP’s policy violates the substantive provisions of the APA, 5 U.S.C. § 706(2)(A), the district court concluded that the factual record was insufficient to grant summary judgment to appellants. The district court therefore remanded this case to OPM, which had succeeded the Commission as the agency with responsibility to concur in maximum age policies, for a review of the propriety of BOP’s policy as applied to each job classification for employees in correctional facilities. Finally, the district court reviewed OPM’s findings and concluded that the maximum age policy was neither arbitrary nor capricious. See Stewart v. Civiletti, No. 77-0398 (D.D.C. Dec. 14, 1979); J.A. 333. Although the district court’s opinion did not address appellant’s argument that the maximum age rule was established in violation of the APA’s notice and comment rulemaking procedures, the court stated that this argument had been fully briefed and considered when it denied rehearing. See Stewart v. Civiletti, No. 77-0398 (D.D.C. Jan. 29, 1980); J.A. 340.
II. THE SCOPE OF AGENCY DISCRETION UNDER SECTION 3307(d)
As the district court noted, there is no dispute in this case over the need to reconcile 5 U.S.C. § 3307(d) with the provisions of the ADEA. While section 3307(d) specifically authorizes agencies to set age requirements for appointment to law enforcement positions, the ADEA requires that federal personnel actions “be made free from any discrimination based on age,” except when the Equal Employment Opportunity Commission (“EEOC”) establishes that age is a “bona fide occupational qualification necessary to the performance of the duties of [a] position.” 29 U.S.C. § 633a(b).[23] The parties offer radically different suggestions, however, on how these statutes may best be reconciled.
Appellants argue that we should read section 3307(d) as merely authorizing *491 maximum entry ages, while the ADEA provides the standard for determining whether a maximum entry age is appropriate. Appellants principally rely on language in the legislative history of section 3307(d), indicating Congress’ concern with the arduousness of law enforcement work. They reason that this concern is fully compatible with the ADEA’s bona fide occupational qualification standard. Appellants’ Brief 18-23. In addition, appellants note that section 3307(d) is a specific exception to 5 U.S.C. § 3307(a), a provision which proscribes the use of any appropriated funds to pay the salary of any federal employee who establishes a maximum age policy for admission to the competitive service.[24] Thus, they conclude, section 3307(d) was designed to serve the special and limited purposes of removing the threat of personal liability from officials who establish maximum age policies, and lifting section 3307(a)’s per se rule against maximum age policies. Under this reading, section 3307(d) simply authorizes the use of an otherwise prohibited age discriminatory practice — maximum age entry rules.[25] The legality of a maximum age entry policy would nonetheless be contingent on whether it meets the ADEA’s bona fide occupational qualification standard.[26]
Appellees argue in rebuttal that the statutory scheme proposed by appellants .ignores Congress’ “specific finding that maximum entry ages are appropriate for law enforcement officers.” Appellees’ Brief 12. In addition, appellees note that section 3307(d) and the ADEA set out different *492 procedures for establishing age based requirements. Whereas section 3307(d) specifically requires that the agency propose a maximum age rule, and that the President’s designate (currently OPM) concur in the policy, the ADEA presently gives the EEOC sole authority to establish exemptions to the general rule against discrimination based on age. Thus, appellees argue, section 3307(d) takes maximum age rules for law enforcement officers outside the ambit of the ADEA.
When faced with apparently conflicting statutes, our first task is to examine their language to determine whether they may be reconciled. See United States v. Will, 449 U.S. 200, 221-22, 101 S.Ct. 471, 483-84, 66 L.Ed.2d 392 (1980); United States v. Borden Co., 308 U.S. 188, 198-99, 60 S.Ct. 182, 188-89, 84 L.Ed. 181 (1939). When one statute speaks in general terms while the other is specific, conflicting provisions may be reconciled by carving out an exception from the more general enactment for the more specific statute. See Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 228, 77 S.Ct. 787, 791, 1 L.Ed.2d 786 (1957); C. Sands, Statutes and Statutory Construction ¶ 23.16 (4th ed. 1972). But even when the literal terms of statutory provisions would allow the specific language to be controlled by the more general, we cannot ignore evidence that Congress intended to address a specific situation through special legislation. See, e.g., Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 228, 77 S.Ct. 787, 791, 1 L.Ed.2d 786 (1957); MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944); Castaneda Gonzalez v. Immigration & Naturalization Service, 564 F.2d 417, 423 (D.C.Cir.1977). In this case, applying the ADEA to the establishment of maximum entry ages for law enforcement officers would require us to adopt a strained reading of section 3307(d) and to ignore Congress’ clear intent to employ maximum entry ages as a means towards securing a “young and vigorous” work force of law enforcement officers. We therefore agree with the district court that section 3307(d) is an exception to the ADEA.
We must begin by admitting that the plain language of section 3307(d) is not clearly inconsistent with the ADEA. As appellants note, the authority granted agencies to establish maximum entry ages could be read as simply lifting the per se rule, embodied in section 3307(a), against maximum age policies for entry into the competitive service. Appellants’ attempt to superimpose ADEA standards on agency discretion under section 3307(d), however, seems problematic when section 3307(d) is read in its entirety; for instead of simply lifting a general ban on agencies’ setting age qualifications for law enforcement employment, section 3307(d) sets forth a specific procedure for agencies to follow in setting such qualifications. Under section 3307(d), and implementing executive orders, an entry age qualification must be proposed initially by the agency and concurred in by OPM. In contrast, the ADEA vests sole authority to establish exemptions from the general ban against age discrimination with the EEOC.[27] These provisions do not, in themselves, set up an irreconcilable conflict, since all three agencies could be required to concur in a maximum age policy. But in the absence of any indication that Congress intended such a dual procedure, the result would, at the least, require an awkward reading of Congress’ enactments. And, once the legislative history of section 3307(d) is examined, it is evident that Congress meant to do what the statute’s terms suggest, namely, to provide for maximum age requirements for law enforcement officers on the theory that these jobs involve special concerns that require consideration of factors not ordinarily accounted for in the ADEA’s independent scheme for evaluating age restrictions.
*493 Congressional efforts to secure a “young and vigorous” law enforcement work force through retirement legislation date back to 1947.[28] Under this early legislation, law enforcement officers who completed 20 years of hazardous duty could retire early at high pensions. The theory behind special retirement provisions for law enforcement officers was that higher pensions would encourage law enforcement officers to retire earlier. The House and Senate reports on the bill that became Public Law 93-350, however, found that this simple logic had failed to yield the desired result. Rather than producing a “young and vigorous” work force, enhanced pensions had boomeranged. Highly capable workers were retiring after 20 years of service, while many less capable employees were staying on until their 70th birthday, in order to acquire 20 years of covered employment. Furthermore, early retirement was a one way street. Employees could choose to retire early, but the agency had no authority to require them to do so.[29]
Public Law 93-350 was designed to remedy this situation. First, the law restructured retirement annuities so that law enforcement officers would have less of an incentive to remain in their jobs after 20 years of service.[30] Second, Public Law 93-350 instituted mandatory retirement provisions, under which law enforcement officers would have to retire at age 55 or after 20 years of service, whichever came later. Agencies were, however, given discretion to keep employees on until their 60th birthdays if, in the agencies’ judgment, such an action would further the public interest. See 5 U.S.C. § 8335(g).
Congress provided agencies with authority to set maximum entry ages to enhance the new statutory scheme. The Senate Report, for example, noted that a maximum entry age would serve to make early retirement “an attractive option.” S.Rep.No.93-948, 93d Cong., 2d Sess. 4 (1974). By setting a maximum entry age, an agency could keep out those employees who would be unaffected by the statute’s retirement incentives because they would simply not have served long enough to qualify for retirement. Maximum entry ages would also serve to “implement the feasibility of compulsory retirement.” H.R.Rep.No.93-463, 93d Cong., 1st Sess. 3 (1973). In its letters to the relevant congressional committees, the Civil Service Commission elaborated on this aspect of a maximum entry age provision. It stated that “[it] is important ... to have a limit on the age of entry that is related to [mandatory retirement at age 55] so persons entering the occupations can be provided a full career.” Id. at 9; S.Rep.No.93-948, 93d Cong., 2d Sess. 6 (1974).
This legislative history indicates Congress’ unequivocal intention to provide agencies with authority to structure their hiring practices so as to implement Public Law 93-350’s retirement scheme for law enforcement officers. Of course, as appellants point out, Congress did not require agencies to adopt maximum entry age rules. But Congress did indicate its clear intention to give agencies the flexibility to use maximum age entry rules in order to achieve the statute’s overall objective of securing a “young and vigorous” law enforcement work force.[31] BOP’s maximum *494 age policy must therefore be scrutinized in terms of its rational relationship to the legislative scheme underlying section 3307(d), rather than the independent legislative scheme set forth by the ADEA.
III. REASONABLENESS OF BOPS POLICY
Even if section 3307(d) is read independently from the ADEA, appellants contend that BOP’s maximum age policy should be struck down as not reasonably related to section 3307(d)’s statutory objective. In essence, appellants argue that regardless of whether section 3307(d) requires that age be a bona fide occupational criterion, it still mandates that agencies setting maximum age policies be guided by the anticipated ability of the class of rejected applicants to perform the relevant tasks 20 years later when they would reach- mandatory retirement. Appellants’ Brief 31-37. Appellants’ contentions, however, do not account for Congress’ express judgments that age 55 is an appropriate age for requiring law enforcement officers to retire and that 20 years’ service is the appropriate criterion for full retirement benefits. Since BOP’s choice of age 34 is responsive to both these congressional determinations, the propriety of the maximum age policy here essentially turns on whether BOP has properly designated the relevant employees as law enforcement officers.[32]
A. Determining Who is a Law Enforcement Officer
BOP originally based its proposal that all employees in correctional facilities be considered law enforcement officers on its experience under the law enforcement retirement laws in effect before the enactment of Public Law 93-350. Under the earlier law, there was no direct relationship between job titles and retirement provisions. Instead, law enforcement officers had to apply individually for early retirement with beneficial pensions. See Pub.L. No. 80-879, 62 Stat. 1221 (1948). With Public Law 93-350, however, the position itself determines which set of retirement and pension provisions an employee is subject to. BOP reasoned that since most employees in correctional facilities had received enhanced pensions under the earlier law, they should continue to do so under Public Law 93-350.
OPM’s detailed review of positions in BOP correctional facilities, conducted on remand, upheld the validity of BOP’s original determination. Following the district court’s order, BOP provided OPM with additional information on the 766 job positions in correctional facilities for which the job descriptions themselves did not on their face demonstrate that the jobs involved frequent direct contact with inmates.[33] OPM reviewed this information and concluded that it lacked a sufficient basis to deter *495 mine whether 24 of the positions should be classified as “law enforcement officer” jobs within the meaning of 5 U.S.C. § 8381(20). OPM then sought additional information from BOP on those 24 before concluding that BOP’s original determination was correct.
Following this review, OPM sent one of its reviewers to the United States Penitentiary at Lewisburg, Pennsylvania, and the Federal Prison Camp at Allenwood, Pennsylvania. As OPM explained in its letter to appellants’ attorney, the reviewer concluded that all employees in correctional facilities “are either required to work in close daily contact with inmates or must continually pass through areas where inmates are housed, are working or are engaged in recreational activities.” In addition, the reviewer noted that administrative employees, whose job titles do not suggest frequent direct contact with inmates, would nonetheless “encounter inmate details such as messengers, clerks, cleaning crews, and repair crews as well as inmates on official business, such as parole hearings, registering complaints, or merely seeking personal information.”[34] We agree with the district court that these findings provide a rational basis for BOP’s determination that all employees in correctional facilities fall within the statutory definition of a law enforcement officer.[35]
B. Setting the Maximum Entry Age at 34
As the district court concluded, BOP’s choice of 34 as the maximum age for entry into its law enforcement positions is supported by Public Law 93-350’s statutory scheme. Both the provisions encouraging retirement and those requiring retirement look to whether an employee has completed 20 years of service. See 5 U.S.C. §§ 8335(g), 8336(c). Since these provisions were enacted in order to promote the “youth and vigor” of the law enforcement profession, their effectiveness could be undermined if original appointments to law enforcement positions were made to individuals who would not complete 20 years of employment by the time they reached the ages which trigger those sections. Indeed, a maximum entry age of 29 could be justified as necessary to implement the incentive program for early retirement at age 50. See 5 U.S.C. § 8336(c). Of course, an agency is under no requirement to set a maximum entry age, so that there is no congressional “mandate” to set the age at either 29 or 34. But since agencies received the authority to set such a maximum age in the very legislation that set up these retirement provisions, an age that furthers their effectiveness seems especially appropriate.
Appellants’ argument that Congress has not indicated its preference for retirement by age 55 is not convincing. Appellants *496 note that mandatory retirement is set at 55 or after 20 years of service, whichever comes later. See 5 U.S.C. § 8335(g). They therefore conclude that Congress contemplated that there would be a “third group” of employees who would not have completed 20 years of service by the time they reached age 55, see Appellants’ Brief 4, and that no preferred retirement age has been set forth by Congress. Appellants are correct, of course, insofar as Congress has left the initial decision to set a maximum entry age to the .individual agencies. But it is hard to see how Public Law 93-350 can be read as being neutral on the question of the desirability of early retirement. Rather than providing for a “third group” that would undermine the overall scheme of Public Law 93-350, it is more likely that Congress sought to preserve the original jurisdiction of agencies to decide whether- to set a maximum age and to provide “grandfather” treatment for law enforcement officers hired before an agency set its maximum entry age.[36]
IV. APPLICABILITY OF NOTICE AND COMMENT RULEMAKING REQUIREMENTS
Appellants also challenge BOP’s policy on the ground that it was not formulated in accordance with the notice and comment rulemaking requirements of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553. Appellants recognize that section 4 expressly exempts “matter[s] relating to agency management or personnel,” but argue that this exemption does not apply when a proposed rule affects persons outside an agency. Appellants’ Brief 49. Since hiring policies have some impact on those outside an agency who wish to be hired, appellants argue that hiring qualifications do not fall within section 4’s exemption.
Whatever the wisdom of allowing for public participation in the development of age qualifications, we cannot agree that such participation is required by section 4 of the APA.[37] We begin our analysis, as always, with the language of the statute itself. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). This language speaks in broad terms, providing that:
This section [on notice and comment rule-making] applies .. . except to the extent that there is involved
(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.
5 U.S.C. § 553(a). Nothing in this statutory language suggests that a personnel matter, such as hiring standards,[38] would be subject to notice and comment rulemaking. On the contrary, this language suggests *497 that whenever the “named subjects are ‘clearly and directly’ implicated,” Humana of South Carolina, Inc. v. Califano, 590 F.2d 1070, 1082 (D.C.Cir.1978), the statutory ex-, emption applies.[39]
Appellants argue that despite this statutory formulation we should read section 4’s exemption as coextensive with the more narrowly framed exemption from publication requirements drawn in section 3 of the original APA.[40] Appellants’ Brief 51-52. They note that the Attorney General’s manual published after the enactment of the APA suggests that the two exemptions are of like scope.[41] Since the manual states that the exemption from publication re *498 quirements is limited to matters that are “solely the concern of the agency proper, and therefore [do] not affect members of the public to any extent,” see U. S. Department of Justice, Attorney General’s Manual on the Administrative Procedure Act 18 (1947), they conclude that only strictly internal matters, such as rules on leaves of absence and vacations, are exempt from notice and comment rulemaking.
To read the two exemptions as identical, however, we would have to ignore considerable differences between the language used in the original APA to draw exemptions to section 3’s publication requirements and section 4’s notice and comment rulemaking requirements. As Judge Leventhal observed in Vaughn v. Rosen, 523 F.2d 1136, 1151 (D.C.Cir.1975) (Leventhal, J., concurring), “the exemption from disclosure to the public [section 3] was not couched in [broad] terms.” Instead, the language of section 3’s exemption required that the material withheld from public view be “solely” related to “internal” management and personnel. Id. at 1150-51. See 5 U.S.C. § 552(b)(2).[42] By way of contrast, as Judge Leventhal noted, “Congress exempted any ‘matter relating to agency management or personnel’ from the rulemaking procedures of the APA.” Vaughn v. Rosen, 523 F.2d at 1151 (Leventhal, J., concurring). Given these differences in statutory language, it is unlikely that Congress intended the two exemptions to be read as one and the same. Indeed a strict parallel reading of the management and personal exemptions to the two sections makes little sense in the light of their differing functions. While section 3 opens agency determinations to public view, section 4 requires that agency determinations be preceded by a notice and comment period. Thus section 4 creates a far greater administrative burden than section 3 and is not needed to remove government activity from a shroud of secrecy. These different functions are reflected throughout sections 3 and 4, which require that many matters that are not subject to notice and comment rulemaking nonetheless be made public. Compare, e.g., 5 U.S.C. § 552(a)(1)(C) (requiring publication of rules of procedure) and 5 U.S.C. § 552(a)(1)(D) (requiring publication of statements of general policy or interpretations of general applicability formulated and adopted by an agency) with 5 U.S.C. § 553(b)(A) (excepting from notice and comment procedures “interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice”). See S. Breyer & R. Stewart, Administrative Law and Regulatory Policy 479 n.19 (1979).[43]
Our conclusion that section 4’s exemption does not mirror section 3’s does not, of course, tell us whether all personnel-related matters are exempt from notice and comment rulemaking. Prior cases touching on the latter question have suggested that a rule may not be characterized as one of “management” or “personnel” if it has a substantial effect on persons outside the agency.[44] Relying on a litmus test of substantial external effect, appellants contend *499 that age requirements fall outside section 4’s exemption because they “affect” those outside the agency who are precluded from job opportunities. We think that appellant’s argument proves too much. The effect of BOP’s policy on those outside the agency is akin to that of any hiring standard. Hiring standards, by definition, determine who will be eligible for government employment and who will not.. Yet hiring standards have never been considered to fall outside section 4’s exemption for personnel matters. Indeed, when the Civil Service Commission concurred in the maximum age rule, its longstanding practice was to review job qualifications through internal review procedures and, once formulated, make those standards public. The Commission’s procedures formulating hiring criteria were set forth in the Federal Personnel Manual[45] Generally, job qualifications were based on studies by occupational specialists who determine those “characteristics which are necessary for successful job performance.” Federal Personnel Manual Supp. 271-1 7. Proposed qualifications were reviewed both for their consistency with established job classifications and for their consistency with statutory directives. For example, the Commission would review physical requirements to ensure that they only stated the minimum physical abilities necessary to perform a job. See Federal Personnel Manual 339-7 (July, 1969). Similarly, the Commission would review educational requirements to determine whether they complied with 5 U.S.C. § 3308 which prohibits minimum educational requirements “except when [the Commission] determines that the duties of a scientific, technical, or professional position cannot be performed by an individual who does not have a prescribed minimum education.” Pursuant to 5 U.S.C. § 3308, such educational requirements must be published in the Federal Register together with an explanation of the reasons for their establishment. Other standards were published “in the appropriate Commission issuance system, or [were] otherwise made a matter of record.” Federal Personnel Manual Supp. 271-1 15. At no point, however, would the Commission formally solicit comments from the public on proposed qualifications.
The Commission’s implied determination that it need not follow notice and comment rulemaking procedures in formulating hiring standards was certainly a reasonable interpretation of the plain language of the personnel and management exemption.[46] Furthermore, it appears that Congress had acquiesced in this agency interpretation, since in prescribing, special procedures for developing some job qualifications, such as minimum educational requirements, it did not require notice and comment rulemaking. See 5 U.S.C. § 3308. With regard to maximum entry ages Congress only required that an agency’s recommendation be concurred in by the President’s designate. See 5 U.S.C. § 3307(d). It did not suggest that these hiring standards be treated any differently from other hiring standards for purposes of notice and comment rulemaking [47]
Finally, appellants suggested at oral argument that even if hiring standards, in *500 general, fall within the personnel exemption to notice and comment rulemaking, we should make an exception when a hiring rule concerns national civil rights policy.[48] We fail to see, however, how this argument can be squared with the explicit authority granted agencies to set maximum entry ages for law enforcement officers. By providing agencies with special authority to establish maximum entry ages, Congress sought to solve problems of agency management that had emerged under prior law.[49] As we have observed, this special legislation served to remove maximum entry ages for law enforcement officers from the scope of the ADEA and represents Congress’ judgment that such maximum entry ages are an appropriate tool for controlling the age composition of an agency’s work force.
V. PROPRIETY OF REMAND
Appellants’ final argument is that the district court erred by remanding this case to the OPM for a detailed review of the positions covered by the maximum age rule. Appellants contend that OPM’s review simply provides a post-hoc rationalization of its policy and therefore should not be considered in determining the policy’s validity.[50] Appellants’ Brief 56-60.
In remanding this case to OPM, the district court sought to have the organization with the greatest expertise conduct the detailed factual review of BOP’s maximum age policy. In essence, the district court concluded that it could not determine the policy’s validity without such a factual review and, at its discretion, sought OPM’s expertise. See Lodge 1858, American Federation of Government Employees v. Webb, 580 F.2d 496, 509 (D.C.Cir.), cert. denied, 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 319 (1978). Appellants simply misread the district court’s opinion when they state that the district court first found the policy to be illegal, and then permitted the wrongdoers to justify it in retrospect. On the contrary, the district court had not found a problem with the way in which the policy was formulated, but instead found the record inadequate to judge its validity.
For the foregoing reasons,[51] we affirm the district court’s order granting summary judgment to appellees.

. The Bureau of Prisons’ policy provided for some exceptions, none of which is relevant to this case. See n. 16 and p. 489 infra.

. See H.R.Rep.No.93-463, 93d Cong., 1st Sess. 3-4 (1973) (“H.R.Rep.”); S.Rep.No.93-948, 93d Cong., 2d Sess. 2 (1974) (“S.Rep.”), U.S.Code Cong. & Admin.News 1974, p. 3698. Public Law 93-350 was also designed to yield a more youthful force of federal firefighters.

. Section 4 of Public Law 93-350, codified at 5 U.S.C. § 8335(g), provides in part:
A law enforcement officer .. . who is otherwise eligible for immediate retirement under section 8336(c) of this title shall be separated from the service on the last day of the month in which he becomes 55 years of age or completes 20 years of service if then over that age. The head of the agency, when in his judgment the public interest so requires, may exempt such an employee from automatic separation under this subsection until that employee becomes 60 years of age.
This provision did not take effect until January 1, 1977.

. Section 6 of Public Law 93-350, codified at 5 U.S.C. § 8339(d), provides that a law enforcement officer’s annuity is calculated at 2V2 percent of his “average pay” for each of the first 20 years of service and 2 percent of his “average pay” for any additional years. Under a prior law, a law enforcement officer could retire at age 50 with an annuity of 2 percent of his “average pay” multiplied by the number of years of service, see 5 U.S.C. § 8339(d) (1970), so long as he had completed 20 years of service, the head of his agency recommended that he receive an enhanced pension, and the Civil Service Commission (“Commission”) concurred. See 5 U.S.C. § 8336(c) (1970). Those employees whose positions were not considered to involve “primarily the investigation, apprehension or detention of individuals suspected or convicted of offenses against the criminal laws of the United States,” 5 U.S.C. § 8336(c) (1970), would receive only the basic pension for civil service employees: IV2 percent of their “average pay” for each of their first five years; 13U percent of their “average pay” for the next five years; and 2 percent of the “average pay” for any additional years’ pay. See 5 U.S.C. § 8339(a) (1970). For each of these formulae, “average pay” is based on the three years of highest pay during the relevant period. See Letter of Robert Hampton, Chairman, Civil Service Commission, to Hon. Gale W. McGee, Chairman, Committee on Post Office and Civil Service (Oct. 3, 1973), reprinted in S.Rep. 5-8; 5 U.S.C. § 8331(4).
Public Law 93-350 was expected to improve incentives for early retirement in two ways. First, by providing an extra half a percentage point multiple for the first 20 years of service, the bill made it “more economically practicable” for law enforcement officers to retire early. H.R.Rep. 4; see S.Rep. at 3-4. Second, by lowering the rate of computation for years of service in excess of 20 years, Public Law 93-350 was expected to “[make] it less worthwhile” to work beyond 20 years. S.Rep. 4. There is some question, however, as to whether the retirement scheme has substantially affected the average age of law enforcement officers’ retirement. See Comptroller General of the United States, Special Retirement Policy for Federal Law Enforcement and Firefighter Personnel Needs Reevaluation 7-9 (1977), reprinted in Joint Appendix (“J.A.”) 260-62.

. 5 U.S.C. § 3307(d), enacted as section 1 of Public Law 93-350, provides:
The head of any agency may, with the concurrence of such agent as the President may designate, determine and fix the minimum and maximum limits of age within which an original appointment may be made to a position as a law enforcement officer ... as defined by section 8331(20) ... of this title.

. Following Exec.Order No. 12,107, 3 C.F.R. 294 (1979), this concurrence responsibility has been transferred to the Office of Personnel Management (“OPM”).

. Under section 8331(20), an employee is classified as a law enforcement officer if “the duties of [his] position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States.” Section 8331(20) proceeds to offer the more detailed explanation of “detention” duties as those that involve frequent direct contacts with inmates.

. See Exec.Order No. 11,817, 3A C.F.R. 200 (1975), reprinted in 5 U.S.C. § 3307 note.

. 3 C.F.R. 323 (1979), reprinted in 5 U.S.C.App. 357 (Supp. II 1979).

. See Exec.Order No. 12,107, 3 C.F.R. 264 (1979).

. See Letter of Robert S. Smith, Director of Personnel, Department of Justice, to Thomas A. Tinsley, Director, Bureau of Retirement, Insurance, and Occupational Health, Civil Service Commission (Jan. 10, 1975); J.A. 113.

. Ordinarily, the Commission requires an agency to submit a detailed description of the duties of those jobs the agency wishes to have classified as law enforcement positions. See Federal Personnel Manual Letter No. 831-41 (Dec. 27, 1974). The Department did not follow these procedures because of the volume and variety of position descriptions and BOP’s prior experience that most of these jobs had been classified as law enforcement positions under prior law. See Letter of Robert S. Smith, Director of Personnel, Department of Justice, to Thomas A. Tinsley, Director, Bureau of Retirement, Insurance, and Occupational Health, Civil Service Commission (Jan. 10, 1975); J.A. 113.

. See Letter of Thomas A. Tinsley, Director, Bureau of Retirement, Insurance, and Occupational Health, Civil Service Commission, to Robert S. Smith, Director of Personnel, Department of Justice (Mar. 12,1975); J.A. 116.

. BOP first proposed institution of a maximum age policy on August 26, 1974. See Memorandum from Norman A. Carlson, Director, Bureau of Prisons, to Glen E. Pommering, Assistant Attorney General for Administration; J.A. 117. On November 26, 1974, this proposal was forwarded to the Commission. See Letter of Robert S. Smith, Director of Personnel, Department of Justice, to Raymond Jacobson, Director, Bureau of Policies and Standards, Civil Service Commission; J.A. 106. During the following month, the Commission set up meetings to discuss standards for setting maximum age rules. See Letter of Raymond Jacobson, Director, Bureau of Policies and Standards, Civil Service Commission, to William B. Saxbe, Attorney General (Dec. 23, 1974); J.A. 119. At these meetings, representatives of the Commission clarified the Commission’s criteria for approving maximum age requirements. See Letter of Raymond Jacobson, Director, Bureau of Policies and Standards, Civil Service Commission, to Robert S. Smith, Director of Personnel, Department of Justice (Feb. 16, 1975); J.A. 120.

. See Letter of Edward H. Levi, Attorney General, to Robert E. Hampton, Chairman, Civil Service Commission (Apr. 28, 1975); J.A. 125.

. Id. The Department’s proposal also included a blanket exemption for medical officers and dental officers. See Memorandum from Raymond Jacobson, Director, Bureau of Policies and ' Standards, Civil Service Commission, to the Civil Service Commission (May 23, 1975); J.A. 126.

. Memorandum from Raymond Jacobson, Director, Bureau of Policies and Standards, Civil Service Commission, to the Civil Service Commission (May 23, 1975) at 5; J.A. 130. The policy was formally established by the Department on July 16, 1975, pursuant to DOJ Order 1338.1. This order was replaced by DOJ Order 1338.1A on October 4, 1976. The revision did not represent any substantive change in the policy.

. Stewart was forty-two years old when she telephoned the correctional facility at Alderson. See Plaintiffs Statement of Material Facts As to Which There is No Genuine Issue; J.A. 284.

. See Letter from Jeanne Monk, ADEA Program Coordinator, Civil Service Commission, to Daryl G. Stewart (Oct. 6, 1979); J.A. 24.

. The defendants named in Plaintiffs Second Amended Complaint were Griffin B. Bell, Attorney General of the United States, Alan K. Campbell, Chairman, Civil Service Commission, Georgiana Sheldon and Ludwig J. Andolsek, Commissioners, Civil Service Commission, and Norman A. Carlson, Director, Bureau of Prisons; J.A. 8-9.

. Appellant Herbst sought both injunctive relief and back pay. See Plaintiffs Second Amended Complaint; J.A. 23.

. Appellants’ motion for summary judgment only sought to have BOP’s policy declared invalid. Appellants did not seek summary judgment on appellant Herbst’s back pay claim.

. At the time BOP adopted its maximum age policy, the Civil Service Commission had responsibility for carrying out the provisions of the ADEA which apply to federal employees. See 29 U.S.C. § 633a (1970 & Supp. V 1975). In 1978, this responsibility was transferred to the Equal Employment Opportunity Commission (“EEOC”). See Reorg.Plan No. 1 of 1978, 3 C.F.R. 321 (1979), reprinted in 5 U.S.C.App. 354 (Supp. Ill 1979).

. 5 U.S.C. § 3307(a) provides that:
Except as provided in subsections (b), (c), and (d) of this section appropriated funds may not be used to pay the salary of an employee who establishes a maximum-age requirement for entry to the competitive service.
Section 3307(a) was enacted as a rider to the Independent Offices Appropriation Act, 1957, Pub.L. No. 84-623, 70 Stat. 339 (1956). Subsequent Congresses carved out specific exceptions to this prohibition. Thus, pursuant to Pub.L. No. 91-73, 83 Stat. 116 (1969) (currently codified at 5 U.S.C. § 3307(c)), the Sécretary of Interior is authorized to fix age requirements for appointment to the United States Park Police. An additional exception was created in 1972 for an original appointment to a position as an air traffic controller. See Pub.L. No. 92-297, 86 Stat. 141 (1972) (codified at 5 U.S.C. § 3307(b)).

. Implicit in appellants’ argument is the premise that, absent a specific exception such as that for law enforcement officers, section 3307(a) serves to bar maximum age policies for original appointments. Thus, in most cases, even if a maximum age rule could be justified under the ADEA’s bona fide occupational qualification test, it would still be invalid under section 3307(a). OPM appears to disagree with this reading of these statutory provisions. See Federal Personnel Manual 338-B-l (May 7, 1981) (explaining OPM’s procedures for approving maximum entry ages under the ADEA’s provisions for reasonable exemptions). Apparently, OPM would contend that the ADEA impliedly repealed section 3307(a)’s flat prohibition on maximum entry age rules. Because we find that section 3307(d) provides independent authority for maximum age rules, we need not reach the question of section 3307(a)’s continued validity.

. In order to qualify as a bona fide occupational qualification, it is generally established that a maximum age entry rule would have to meet a two pronged test: (1) that the rule is “reasonably necessary” to the essence of a job activity; and (2) that there is a “factual basis” for believing that persons within the excluded class would be unable to safely and efficiently perform the duties of the job. See Smallwood v. United Air Lines, Inc., 661 F.2d 303, 307 (4th Cir. 1981); Arritt v. Grisell, 567 F.2d 1267, 1271 (4th Cir. 1977); Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224, 236 (5th Cir. 1976); EEOC v. County of Allegheny, 519 F.Supp. 1328, 1333 (W.D.Pa.1981). Cf. Hodgson v. Greyhound Lines, Inc., 499 F.2d 859, 863 (7th Cir. 1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975) (requiring bus company to demonstrate a “rational basis in fact” that elimination of maximum hiring rule for drivers would increase the risk of harm to passengers). This standard is highly sensitive to the factual record in individual cases. Compare Smallwood v. United Air Lines, Inc., 661 F.2d 303, 306-09 (4th Cir. 1981) (finding that a maximum hiring age rule for pilots was not supported by factual record) with Murnane v. American Airlines, Inc., 667 F.2d 98 (D.C.Cir.1981) cert. denied --- U.S. ---, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982) (No. 81-1502) (finding maximum hiring age rule for pilots justified by persuasive evidence that the best experience for higher level employees was experience with the same company in entry level jobs). See generally Rosenblum, Age Discrimination in Employment and the Permissibility of Occupational Age Restrictions, 32 Hastings L.J. 1261, 1269-73 (1981).

. Although, as originally implemented, both responsibilities were carried out by the Commission, the two statutes have always contemplated the possibility of separate implementing agencies. Whereas Congress specifically assigned ADEA responsibility to the Commission, and following reorganization, to the EEOC, section 3307(d) left the setting of maximum entry ages to the agency designated by the President.

. The retirement provisions of Public Law 80-168, 61 Stat. 307 (1947), only applied to special agents of the Federal Bureau of Investigation. The following year Congress extended Public Law 80-168’s beneficial retirement scheme to other employees engaged in law enforcement work. See Pub.L. No. 80-879, 62 Stat. 1221 (1948). For a discussion of these retirement provisions, see note 4 supra.

. See H.R.Rep. at 4.

. See note 4 supra.

. Commentators have criticized the use of age as a proxy for effective job performance. See, e.g., Eglit, Of Age and the Constitution, 57 Chi-Kent L.Rev. 859, 886-88 (1981); Note, Age Discrimination in Employment, 50 N.Y.U. L.Rev. 924, 935 n.64 (1975). Like other classifications based on general characteristics, age qualifications screen out individual candidates without leaving them any room to prove their own abilities. See Schuck, The Graying of Civil Rights Law: The Age Discrimination Act of 1975, 89 Yale L.J. 27, 32-34 (1979). This result *494 is especially troubling when there are ready methods for evaluating the characteristics for which an age requirement serves as a proxy. Cf. Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 327, 96 S.Ct. 2562, 2574, 49 L.Ed.2d 520 (1976) (Marshall, J., dissenting) (compulsory retirement rule for police officers irrational in the light of procedures for testing physical fitness).
Indeed, Congress has recently addressed the wisdom of BOP’s policy of using as low an age as 35 to determine who may be employed as a law enforcement officer. During its last session, the House adopted an amendment to the Justice Department Appropriation Authorization Act, H.R. 3462, 97th Cong., 1st Sess. (1981), providing that BOP could not enforce any age restriction on hiring set below age 45. See 127 Cong.Rec. H2801-03 (1981)., H.R. 3462, however, was not enacted into law, and the continuing resolutions for. fiscal year 1982 have not contained any special provisions regarding BOP’s hiring policy. See Pub.L. No. 97-51, 95 Stat. 958 (1981); Pub.L. No. 97-92, 95 Stat. 1183 (1981). In any event, whatever the desirability of maximum entry ages as a policy matter, we must restrict our inquiry to interpreting the statutes in force at the time BOP adopted its maximum age rule.

. Thus, this case does not require us to determine the scope of agency discretion to set a maximum entry age below age 35.

. See Letter of Alan Campbell, Director, Office of Personnel Management, to Edward C. King (Aug. 27, 1979); J.A. 318. BOP sent OPM the remaining 3,000 position descriptions that on their face met 5 U.S.C. § 8331(20)’s criteria for determining who is a law enforcement officer. BOP certified that these descriptions accurately reflected the nature of each position.

. Id; J.A. 320.

. Appellants urge that these findings do not mesh with other job requirements for employees of correctional facilities. They suggest that the “physical strength, agility, quick and rational decisionmaking ability, and both physical and mental stamina,” that OPM concludes are necessary for any job in a correctional facility, see J.A. 322, do not show up in many of the official job descriptions that appellants included in the record. See, e.g., J.A. 175 (personnel officer); J.A. 146 (cook helper). But see J.A. 161 (need for warden’s secretary to be able to work effectively under pressure). It appears, however, that these job descriptions may not tell the full story on the physical strength needed to work in a correctional facility. According to a BOP policy statement, all employees in correctional facilities are required to undergo medical examinations at the time of their appointment. See Bureau of Prisons’ Policy Statement 339.1, Exhibit A to Defendants’ Responses to Plaintiff’s Requests for Admission, Interrogatories and Request for Production of Documents; Record (“R.”) 42. BOP’s policy statement indicates that even those appointed to clerical positions must have the ability to crawl for two hours. Id. In addition, all employees other than medically exempt employees, (e.g., those who have suffered an injury) are required to undergo physical training for emergency teams. See Deposition of Eugene Miller 14; R. 27A. We recognize, however, that there was conflicting evidence before the district court on the degree of vigor required to fulfill the duties of some positions in correctional facilities. We base our ruling in this case on § 8331(20)’s language, which only requires an assessment of the frequency and directness of employee contacts with inmates.

. See Memorandum from Raymond Jacobson, Director, Bureau of Policies and Standards, to Civil Service Commission (May 22, 1975); J.A. 129.
This reading is reinforced by 5 U.S.C. § 8335(g), which provides that the head of an agency may keep an employee up until age 60 if, in his judgment, “the public interest' so requires.” This provision was designed to take the discretion whether to retire at a later age away from the employee and to give that discretion to the agency. See H.R.Rep. at 6-7.

. The dissent may well be correct in its assessment that sound policy considerations would support the use of notice and comment rulemaking in formulating general hiring standards. See dissenting opinion at 11-13. Indeed, section 201(a) of the Civil Service Reform Act of 1978, Pub.L. No. 95-454, 92 Stat. 1111 (codified at 5 U.S.C. § 1105), which was enacted after BOP’s maximum age policy was put in place, requires the director of OPM to follow notice and comment rulemaking procedures “notwithstanding subsection (a) of section 553.” See note 47 infra. The desirability of procedural safeguards, however, is not the issue in this case. Instead the question before us is simply whether the APA required notice and comment rulemaking when this policy was formulated. If it did not, we cannot invalidate the maximum age rule. See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 545, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978).

. There would appear to be little dispute that hiring standards fall within the ordinary meaning of personnel matters. Even Professor Bonfield, on whose work the dissent places great reliance, concedes that the ordinary meaning of the term “personnel” encompasses matters such as selection of employees. See Bonfield, Military and Foreign Affairs Function Rule-Making Under the APA, 71 Mich.L.Rev. 222, 317 (1972). The same conclusion is reached by *497 the Federal Personnel Manual, which defines “personnel management” to include “the attraction, selection, motivation, leadership, understanding, and utilization of people as individual employees and as members of a work group in accomplishing the missions for which the employing organization is responsible.... ” Federal Personnel Manual 250-3 (Nov. 29, 1968) (emphasis added). Cf. 29 U.S.C. 633a (a) (providing that “personnel actions affecting employees or applicants for employment ... shall be made free from any discrimination based on age”) (emphasis added).

. In Humana, we ruled that section 4’s benefits exemption is not limited to rules affecting beneficiaries but extends to a rule regarding the rate of return on equity capital recoverable by health care organizations that provide services under Medicare. We noted that providers of medical services do not receive governmental assistance “in the strict sense,” yet concluded that since the rule related to benefits it fell within section 4’s “benefits” exemption.
Section 4’s benefits exemption is one of the proprietary function exemptions to notice and comment rulemaking. These exemptions have been the subject of substantial criticism in recent years. See, e.g., Administrative Conference Recommendation No. 16, 1 Administrative Conference of the United States 45 (1970); Bonfield, Public Participation in Federal Rule-making Relating to Public Property, Loans, Grants, Beneñts, or Contracts, 118 U.Pa.L.Rev. 540 (1970) (‘‘Public Participation”). In response to a recommendation of the Administrative Conference, many agencies have voluntarily adopted notice and comment rulemaking procedures. See, e.g., 29 C.F.R. § 2.7 (1981) (Department of Labor). The Administrative Conference has also proposed the abolition of the exemption for military and foreign affairs. See Administrative Conference Recommendation No. 73-5, 3 Administrative Conference of the United States 28 (1974). The Administrative Conference, however, has not proposed that agencies engage in notice and comment rulemaking with regard to personnel and management matters. According to Professor Bonfield, the agency management exemption was not considered in a study he conducted for the Administrative Conference in part because it involves “more difficult” problems than the proprietary exemptions and “[pjractically speaking ... seems to be more impervious to . change.” Bonfield, Public Participation, at 545-46.

. Section 3 of the original Administrative Procedure Act, Pub.L. No. 79-404, 60 Stat. 238 (1946) has been replaced by the Freedom of Information Act, 5 U.S.C. § 552. The personnel exemption to the Freedom of Information Act is read more narrowly than the exemption to section 3 of the original APA. See Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051 at 1057-1058 n.14 (D.C.Cir.1981).

. In discussing the exemptions to section 4 of the APA, the Attorney General’s manual simply states that: “[T]he exemption for matters relating to ‘agency management or personnel’ is self-explanatory and has been considered in the discussion of ‘internal management’ under section 3.” U. S. Department of Justice, Attorney General’s Manual on the Administrative Procedure Act 27 (1947).
The dissent’s construction of section 3’s personnel and management exemption relies almost exclusively on this line in the Attorney General’s manual. Professor Bonfield’s article, for example, places considerable emphasis on the Attorney General’s manual to reach the conclusion that sections 3 and 4 are “supposedly” the same. See Bonfield, Military and Foreign Affairs Function Rule-Making Under the APA, 71 Mich.L.Rev. 221, 317-321 (1972). According to Professor Bonfield, the Attorney General’s conclusion is probably based on a line in the Senate Report stating that the “ ‘exception of matters of management or personnel would operate only so far as not inconsistent with other provisions of the [APA] relating to internal personnel and management.’ ” Id. at 318 (quoting S.Rep.No.79-752, 79th Cong., 1st Sess. 12 (1945), reprinted in Senate Committee on the Judiciary, Administrative Procedure Act, S.Doc. No. 248, 79th Cong., 2d Sess. 199 (1946)). This language, however, only mandates that matters that are exempted from publication also be exempted from rulemaking. It does not require that the two exemptions be considered to be of like scope. Indeed, the Senate Report proceeds to state that the limiting principle on section 4’s exemptions comes from the section’s own terms — namely that the “exceptions apply only ‘to the extent’ that the excepted subjects are directly involved.” Id.

. Although Judge Leventhal did not endorse a literal reading of the term “solely,” 523 F.2d at 1150, accord Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d at 1056, he concluded that this language indicated Congress’ intent to draw a narrower exemption from publication requirements than from notice and comment rulemaking.

. Indeed, the publication section of the original APA contained no exemption for rules relating to public property, loans, grants, benefits, or contracts although section 4 broadly excepted these matters from notice and comment rulemaking.

. See Joseph v. United States Civil Service Comm’n, 554 F,2d 1140, 1153 n.23 (D.C.Cir. 1977); Seaboard World Airlines, Inc. v. Gronouski, 230 F.Supp. 44 (D.D.C.1964). Although these cases speak in terms of “substantial effect,” they involved issues far different from those in this case. In Joseph the issue was whether regulations concerning exemptions from the Hatch Act should be subject to notice and comment rulemaking. These exemptions had a widespread public impact. In contrast, the impact of the hiring rules in this case is limited to those who seek employment. Seaboard, which created the “substantial effect” test is even more off point. That case concerned a post office rule regarding which airlines would carry mail overseas. The Post Office unsuccessfully argued that since the rule was couched in terms of directives to employees, it should be viewed as a personnel matter.

. These procedures are largely unchanged in the current version of the Federal Personnel Manual. We express no opinion as to whether they are consistent with the procedural requirements of the Civil Service Reform Act of 1978. See note 47 infra.

. See note 38 supra.

. Several years after BOP’s maximum age rule was adopted, Congress passed the Civil Service Reform Act of 1978, Pub.L. No. 94-454, 92 Stat. 1111 (1978). To safeguard against the powers consolidated in the Director of OPM, Congress took special measures to ensure that rules and regulations regarding personnel policy would be subject to notice and comment rulemaking. In doing so, however, Congress apparently recognized that the personnel exemption would otherwise serve as a bar to notice and comment rulemaking and, consequently, specifically provided that OPM personnel regulations would be subject to notice and comment rulemaking procedures. See 5 U.S.C. § 1105.
5 U.S.C. § 1105 provides that the director of OPM is “subject to subsections (b), (c), and (d) of section 553 ... notwithstanding subsection (a) of such section 553.” This language first appeared in the House version of the bill that became the Civil Service Reform Act of 1978, as it was reported out of committee. See H.R. 11280, 95th Cong., 2d Sess. (1978), reprinted in *500 1 House of Representatives, Committee on Post Office and Civil Service, Legislative History of the Civil Service Reform Act of 1978 (“Legislative History”) 514 (1979). The Senate version of the bill indicates that the prime concern in overriding subsection (a) was to prevent OPM from invoking the personnel and management exemption. See S. 2640, 95th Cong., 2d Sess. (1978), reprinted in 2 Legislative History 738 (“In the issuance of rules and regulations, the Director of the Office of Personnel Management shall be subject to subsections (b), (c), and (d) of section 553 of this title (notwithstanding the exemption in section 553(a)(2) of this title relating to agency management or personnel)”) (emphasis added). Since the Civil Service Reform Act of 1978 was enacted after the Commission approved the maximum age policy, we need not decide whether its procedural requirements would apply to OPM’s concurrence responsibility under 5 U.S.C. § 3307(d).

. The dissent echoes this suggestion in its proposed test of “broad public concern.” See dissenting opinion at 505.

. See p. 493 supra.

. Appellants refer us to Rodway v. United States Dep’t of Agriculture, 514 F.2d 809 (D.C.Cir.1975). Unlike the present case, Rodway concerned a rule that had been adopted in contravention of the APA’s notice and comment rulemaking requirements.

. Appellants also contest the constitutional validity of BOP’s policy under the equal protection guarantee of the Fifth Amendment. Under Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), equal protection analysis of age discrimination is governed by the rational relationship test. Although maximum entry ages are by no means the only means by which Congress could have sought to achieve its objective of maintaining a vigorous law enforcement work force, we cannot say that Public Law 93-350’s maximum age rules, coupled with its mandatory retirement and retirement incentive provisions, are an irrational means towards that end. Accord Thomas v. United States Postal Inspection Serv., 647 F.2d 1035, 1037 (10th Cir. 1981).